Samantha JOHNSON, Appellant,

v.

DIVISION OF EMPLOYMENT
SECURITY, Respondent.

No. WD 71884.

Missouri Court of Appeals,
Western District.

Sept. 7, 2010.

Samuel I. McHenry, Kansas City, MO, for appellant.

Larry R. Ruhmann, Jefferson City, MO, for respondent.

Before: JAMES M. SMART, JR., P.J., MARK D. PFEIFFER, and CYNTHIA L. MARTIN, JJ.

PER CURIAM:

Samantha Johnson appeals the Labor and Industrial Relations Commission's (hereinafter "Commission") determination that she is disqualified from unemployment benefits under section 288.050.[1] She argues that the Commission erred in finding that she voluntarily left her employment. She contends the record shows that she was discharged (and that she did not, as the Commission believed, voluntarily resign her employment) and contends further that she was not guilty of disqualify-

ing misconduct. Because the record does not show that she voluntarily resigned her employment, and because the record also does not show that Ms. Johnson was guilty of disqualifying misconduct, we reverse the judgment of the Commission.

## Background

Samantha Johnson was an hourly employee for approximately seven months in the packaging department of a plant operated by Farmland Foods, Inc. She started work in October 2008. The last day she performed services for Farmland was Tuesday, May 26, 2009. On Wednesday, May 27, and Thursday, May 28, Johnson was absent from work. She reported that her car had broken down and was being repaired, which resulted in transportation and child care problems.

On both days, Johnson called prior to her shift to report that she could not come into work. She did not get an answer, but left a message. Johnson's shift was from 7 a.m. to 3:30 p.m. Johnson is a single mother residing in the far southeast portion of Kansas City. The record does not show where the Farmland plant is located.

Johnson's transportation issues were slightly more complicated than merely traveling to work. Because her daycare did not start accepting children until 7:30 a.m., yet her shift at work started at 7:00 a.m., she would ordinarily take her children to another person's house rather than directly to day care. She then drove to work to try to be there for the start of her shift at 7:00. Because her car was out of commission, she claimed, she was unable to come in on May 27 and 28.

Johnson testified that she also called Farmland at 1:30 p.m. on May 28, and

1. All statutory references are to the Revised Statutes of Missouri (RSMo) 2000, updated through the 2009 Cumulative Supplement, unless otherwise indicated.

spoke to Sandra in the human resources department to see "if she still had a job." She said that, in that phone conversation on the 28th, Sandra told her that she "wouldn't have a job" if she did not "come in then at that moment."

Johnson said she did not go into work after her 1:30 p.m. phone call to Farmland because she "just couldn't do it" and "couldn't make it." She said that if she "could have" she "would have." The next day, Johnson picked up her final paycheck.

Johnson applied for unemployment benefits. Farmland protested this claim. On August 31, 2009, the Division of Employment Security ("Division") determined that Johnson was disqualified from benefits because she "left work with the employer voluntarily without good cause attributable to the work or the employer."

Johnson appealed to the Division's Appeals Tribunal, which conducted a telephone hearing on September 30, 2009. Johnson testified, as did Farmland's human resources manager. Johnson testified as to her version of the events. The Farmland representative testified that Johnson called in on May 27 and 28 to notify of her absence. Someone in human resources entered in Farmland's records that the absence in each case was for "personal business." The only other relevant testimony was that the absences on May 27 and 28 put Johnson at "13 points" and "15 points" respectively. The human resources manager said that fifteen points is "termination on our attendance program." No testimony was provided as to the functioning of the attendance policy. The Appeals Tribunal issued its decision, again finding that Johnson was disqualified from benefits because she resigned her employment voluntarily.

Johnson appealed to the Labor and Industrial Relations Commission, which affirmed and adopted the Appeals Tribunal's decision, finding it to be "fully supported by the competent and substantial evidence on the whole record and ... in accordance with the relevant provisions of the Missouri Employment Security Law."

Johnson now appeals to this court.

### Standard of Review

 An appellate court may reverse or otherwise modify the Commission's decision only if it finds: "(1) That the commission acted without or in excess of its powers; (2) That the award was procured by fraud; (3) That the facts found by the commission do not support the award; or (4) That there was no sufficient competent evidence in the record to warrant the making of the award." Section 288.210. In the absence of fraud, the Commission's factual findings are conclusive if supported by competent and substantial evidence. Section 288.210; *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222 (Mo. banc 2003). Whether an employee terminated employment voluntarily or was discharged is generally a factual determination. *E.P.M. Inc. v. Buckman*, 300 S.W.3d 510, 517 (Mo.App.2009). However, the standard of review is *de novo* when the issue is whether the facts found by the Commission can, as a matter of law, be considered to constitute a voluntary departure from employment. *Moore v. Swisher Mower & Mach. Co.*, 49 S.W.3d 731, 738 (Mo.App.2001) (quotation omitted); *see also Shields v. Proctor & Gamble Paper Prods. Co.*, 164 S.W.3d 540, 543 (Mo.App. 2005). Similarly, when the issue is whether the claimant was guilty of "misconduct," the standard of review is *de novo* as to whether the facts found by the Commission constitute misconduct. *Williams v. Enter. Rent–A–Car Shared Servs., LLC*, 297 S.W.3d 139, 142 (Mo.App.2009).

In examining the record, we "must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, *i.e.*, whether the award is contrary to the overwhelming weight of the evidence." *Hampton*, 121 S.W.3d at 222–23. The reviewing court is not to view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award. *Id.* at 223. Instead, we must objectively review the entire record, including evidence and inferences drawn therefrom that are contrary to, or inconsistent with, the Commission's award. *E.P.M. Inc.*, 300 S.W.3d at 517.

## Discussion

The Commission found that Johnson's transportation problems were a personal matter, and therefore she "left her work voluntarily" and was disqualified from receiving benefits under section 288.050. That section provides that a claimant shall be disqualified if "the claimant has left work voluntarily without good cause attributable to such work or to the claimant's employer." Section 288.050.1(1). The phrase "left work voluntarily," as used in the statute, actually means "left *employment* voluntarily," or "voluntarily quit employment." [2] The "leaving work" it refers to is not that of an employee sneaking out early at the end of the day, or that of an employee being tardy or taking an unscheduled absence for a day with intent to return to work the next day. The "leaving work" it refers to is the kind of "leaving work" we usually call a resignation or an abandonment of a job or a "quit." In other words, the intent of the subsection is to provide that a person cannot *voluntarily* resign and still draw unemployment

compensation benefits. It also recognizes an exception: the circumstance in which the employee has resigned because of "good cause attributable to the work or the employer."

When an employee has resigned, the employee is not eligible for benefits unless the employee shows that she resigned for good cause attributable to the work or the employer. Johnson's argument, in essence, reveals that the Division is misinterpreting the phrase "left work voluntarily" to mean that she missed scheduled work. Johnson acknowledges that she missed scheduled work, but argues that the record here shows that she was terminated and did not voluntarily resign and was not guilty of misconduct.

No doubt the Division is swamped with claims, but there is a need to obtain sufficient detail in a hearing to allow not only a ruling but also adequate review by the Commission and by this court. *Reno v. Tyson Poultry, Inc.*, 204 S.W.3d 347, 352 (Mo.App.2006). In this case, we know next to nothing about Farmland's attendance policy. We know that Johnson accumulated enough absences to be dismissed under the policy. Johnson, an hourly employee who resided in far southeast Kansas City, notified Farmland on May 27 and 28 before her shift began that she would be absent due to her inoperable vehicle. She stated that when she called at 1:30 p.m. on May 28, she was told that she would be discharged if she did not come in then "at that moment." She said she was unable to do so. She understood she was terminated.

The employer's evidence consisted solely of the fact that Johnson had reached the

---

**2.** This is seen from the very next sentence of the statute which uses the phrase "voluntarily quit employment" as synonymous with "left work voluntarily." Section 288.050.1(1).

Subsection .3 of the statute specifically addresses the matter of absenteeism and tardiness as it may relate to the concept of "misconduct."

mark for dismissal because her absences on May 27 and 28 brought her to "fifteen points," which is termination. There was no explanation as to how the point system works, that is, as to how points are accumulated, or specifically of what Johnson had been informed or when the policy was communicated to Johnson.

The Commission regarded the termination of Johnson's employment for violation of the attendance policy as unequivocally and categorically a "voluntary resignation."

### Absenteeism

It is, however, quirky to use the phrase "voluntary resignation from employment" to describe an employee's absence due to some adverse circumstance, after the employee has conscientiously provided notice of the absence, purports *to want* to be at work, and claims constraint from attendance by circumstances such as sickness or some other difficulty. We understand the phrase "voluntary quit" and "abandonment" when it is applied to an employee *intentionally resigning* from a job, especially when the employee implies that he or she is "fed up" with the job. It is *not* so easily understood in the context of an absent employee whose actions have indicated a desire to keep the job. This distinction should not be a surprise. *See, e.g., Miller v. NuCrown, Inc.,* 238 S.W.3d 233, 235 (Mo.App.2007) (termination was not voluntary "abandonment" of job when claimant faithfully called in notification of illness but was fired for absence nevertheless).

The voluntary resignation idea may have arisen from the fact that sometimes a worker will simply stop coming to work *without notice,* effectively resigning and abandoning the job. *See, e.g., Ewing v. SSM Health Care,* 265 S.W.3d 882 (Mo. App.2008); *Williams v. Dutchtown Care Ctr., Inc.,* 313 S.W.3d 690 (Mo.App.2010). But the reality is that many times absenteeism is caused by things that are unwelcomed and uncontrolled by the worker. *See, e.g., Difatta–Wheaton v. Dolphin Capital Corp.,* 271 S.W.3d 594 (Mo. banc 2008) (employee needed emergency medical treatment in connection with ovarian cancer); *Moore,* 49 S.W.3d 731 (employee arrested and detained for a charge that was later dismissed). In such cases it defies the ordinary meaning of words to call the dismissal a "voluntary quit." *See Difatta–Wheaton,* 271 S.W.3d at 598; *Moore,* 49 S.W.3d at 738.

### *Difatta–Wheaton*: Getting the Statute Right

In *Difatta–Wheaton,* the Court noted that the public policy surrounding the employment security law, Chapter 288, is to set aside "unemployment reserves to be used for the benefit of persons unemployed through *no fault of their own,*" because "[e]conomic insecurity due to unemployment is a serious menace to health, morals, and welfare of the people of this state resulting in a public calamity." 271 S.W.3d at 596 (*quoting* section 288.020.1) (emphasis added). "In other words, the General Assembly sought to provide help to those who were not themselves to blame for their unemployment and, in turn, to have courts construe the specific provisions of Missouri's employment security law accordingly." *Id.* at 598. The employment security law, of course, has nothing to do with the employer's right to discharge an employee. It has to do only with the issue of benefits in connection with the loss of the job.

The Court in *Difatta–Wheaton* was dealing only with the issue of benefit qualification. The Court considered the import of the word "voluntarily" in the language of section 288.050 by taking into account the

general statement of purpose expressed above (to benefit persons unemployed "through no fault of their own"). *Id.* The Court noted that the meaning of the word "fault" is "responsibility for wrongdoing or failure," and noted that "voluntarily" means "proceeding from the will: produced in or by an act of choice." *Id.*

The Court in *Difatta–Wheaton* had before it the case of a claimant terminated because she missed her scheduled return from an authorized medical leave. *Id.* at 595. She did not return to work on May 29 (the day she was scheduled to return) because of sudden excessive bleeding related to her ovarian cancer. *Id.* At 7:30 a.m. that morning, she left a message with her supervisor and promptly provided documentation from her doctor (by fax transmission and hand delivery) indicating her condition and stating that the physician was asserting that she was not physically ready to return to work. *Id.* The employer terminated her due to the absences shortly thereafter. *Id.* She applied for unemployment benefits. *Id.* The Deputy, the Appeals Tribunal, and the Commission all ruled in that case, as they had in many others, that she had *voluntarily* quit her employment. *See id.*

The Court, after considering the plain meaning of the words "voluntarily" and "fault," stated:

> It cannot be said that [the claimant] made a choice or was otherwise responsible for her ovarian cancer, its complications, or the timing of their occurrence. And, she took the steps necessary to preserve her employment given these uncontrollable factors. It would be inconsistent with the statutory language of "no fault" and "voluntarily" to hold otherwise.

*Id.* at 599. The Court, as we have noted, was not saying that the employer had no right to terminate the employee in that case. The Court was dealing only with the issue of whether the claimant qualified for unemployment benefits.

## Rejecting the Unrealistic Terminology

The Division dismisses the significance of *Difatta–Wheaton* as "limited to situations involving a life-threatening medical condition." We do not agree with that characterization. We agree that *Difatta–Wheaton* addresses cases in which the problems are not under the control of the worker so that the worker is not at fault. But the Court's holding reversing the Commission is based on, and flows from, the statutory construction—the language analysis. We would have thought that the Division might want to note the Supreme Court's analysis and understanding of the concepts of *fault* and *voluntariness*, because the Court's *analysis* was not limited to cases of ovarian cancer. In our view, the Supreme Court was rejecting the unrealistic use of language in determining whether a termination for absences can be considered a "voluntary quit."

The plain meaning of the words "fault" and "voluntariness" simply cannot always be stretched as far as the Division sometimes seems to want to stretch them. It took a fact scenario like that in *Difatta–Wheaton* to give the Court the perfect vehicle to address the matter. The truth (and the common sense of it) is that not every failure to show up for work is an intentional rejection of the job.

Ironically, the Division cites *Difatta–Wheaton* for the proposition that the claimant "voluntarily caused her own unemployment." This would suggest that despite the plain language of the Court's opinion, the Division clings to the view that absenteeism equals a "voluntary quit" (except in the rare case of a life-threatening cancer condition). If the Division is "pigeonholing" *Difatta–Wheaton* as applicable

only to life-threatening cancer cases—as simply a unique exception to the *per se* rule that absenteeism equals voluntary resignation—and are ignoring the analysis of the case, such pigeonholing will perpetuate the unfortunate semantical confusion about the statutory terms.

We believe the Court was effectively suggesting that the Division discard the practice of regarding absence as always involving a voluntary resignation. Of course, there will always be some voluntary quits, and some will be associated with a worker simply not showing up without warning, never to be seen again; but not every *discharge* for absence can be called a voluntary quit in a culture in which words actually have meaning. Perhaps the Division, in conducting a hearing, might want to consider such matters as whether the claimant's actions (such as failing to call in an absence) demonstrate that the claimant, in failing to provide notice, was effectively expressing an intentional rejection of the job.

### Attendance Policies

Many employers allow a certain number of unscheduled absences for personal reasons before they discharge the worker. Because life has its difficulties, such a policy is not only practical from the employer's point of view, but also better for the public welfare and more consistent with the public policy underlying the unemployment compensation law.

The General Assembly has recognized the merit of reasonable attendance policies in section 288.050.3 by amending that sub-section to allow violation of attendance policies to be considered to be "misconduct" disqualifying the claimant when the claimant fails to rebut the presumption of misconduct. We suppose that the kind of misconduct that occurs in the case of excessive absence is conduct that can ordinarily be described as *"negligence in such degree or recurrence as to manifest culpability."* See section 288.030.1(23). In some cases, perhaps, one could also call it "wanton ... disregard for the employer's interests." [3]

The 2006 amendment to 288.050.3 provides that violation of an employer's attendance policy may create a "rebuttable presumption" of misconduct:

> 3. Absenteeism or tardiness may constitute a rebuttable presumption of misconduct, regardless of whether the last incident alone constitutes misconduct, if the discharge was the result of a violation of the employer's attendance policy, provided the employee had received knowledge of such policy prior to the occurrence of any absence or tardy upon which the discharge is based.

The General Assembly recognized that it is difficult for the employer to prove that the claimant was guilty of fault in being absent if the claimant contends otherwise because the employer lacks access to the pertinent information. The legislature decided that once the employer has established that there is an attendance policy and proves that the claimant had notice of the policy at the time of all the pertinent absences, and that the claimant still ex-

---

**3.** In many earlier cases involving excessive absences, the issue was approached as one of "misconduct" rather than as an issue of "voluntary quit." *See, e.g., Div. of Emp't. Sec. v. Gardner–Denver Mach., Inc.,* 941 S.W.2d 13 (Mo.App.1997); *Kelley v. Manor Grove, Inc.,* 936 S.W.2d 874 (Mo.App.1997); *G.C. Servs. Ltd. P'ship, v. Labor & Indus. Relations Comm'n,* 913 S.W.2d 411 (Mo.App.1996). In those cases the ruling was typically in favor of the claimant. In 1997, the General Assembly, perhaps in response to such cases, amended 288.050 to recognize that absenteeism *could* rise to the level of "misconduct," but the amenders did not specify, as a practical matter, how the inquiry would be approached.

ceeded the allowed absences, the burden shifts to the claimant to show that the claimant was not guilty of "misconduct." If the claimant manages to persuade the hearing officer that he or she was the victim of circumstances beyond his or her control, the claimant may prevail. The claimant bears the risk of non-persuasion.

Here, Johnson showed that her non-attendance on May 27 and 28 was due to a transportation problem. We do not have knowledge of the circumstances of any other absences. Transportation to work, of course, is generally the responsibility of the employee. *Woolridge v. Labor & Indus. Relations Comm'n*, 643 S.W.2d 317, 319 (Mo.App.1982). Nevertheless, the employee's failure to report in as scheduled due to transportation problems does not *necessarily* or *automatically in the abstract* mean the employee is guilty of misconduct. *See, e.g., Williams*, 297 S.W.3d at 143–44. On the other hand, if an employee frequently fails to honor scheduled work times in violation of the employer's policy, that fact may raise a presumption that the employee is "negligent in such degree or recurrence as to manifest culpability," or is "wantonly disregarding the interests of the employer."

After casually skipping work (carelessly using up their allotted absences) and thereby putting themselves in a position where they are then more vulnerable to the difficulties of life such as transportation, sickness, and child care difficulties, employees cannot expect, upon termination, to draw unemployment compensation as though they were terminated through no *fault* of their own. Section 288.050.3. At the same time, we also recognize that the employer wishing to avoid

unemployment claims should have a reasonable attendance policy [4] that is communicated clearly to the employee so that the conscientious employee has appropriate warning and a reasonable opportunity to avoid termination.

The recent amendments suggest that the General Assembly has been attempting to direct the analysis away from the unrealistic use of the concept of "voluntary quit" and is seeking to show a preference for "misconduct" analysis in cases in which the employee purports to want to remain employed but is absent.

A rule that absenteeism is always a voluntary quit tends to be efficient and tidy to administer, and helps protect the financial soundness of the compensation fund, but also to a significant extent defeats the expressed purpose of the fund (to compensate those losing work through no fault of their own).

The word "voluntary" is not defined in Chapter 288. Therefore, we assume the word was intended to have its ordinary meaning. Section 1.090. The concept of "voluntary quit" should therefore, we submit, presumably be reserved for those cases in which the employee not only does not show up, but also impliedly rejects the employment and the employer by some action such as failing to provide notification of the absence.

The word "misconduct," in contrast to the word "voluntary," *is* defined in Chapter 288. Section 288.030.1(23). We know from that definition that "misconduct" can include negligence that is of such a degree or recurrence as to be culpable (in other words, conduct in which we recognize fault—fault to which responsibility is as-

---

4. It should be obvious that an *unreasonable* attendance policy might not properly allow the attribution of any *fault* to the employee in connection with a discharge. Generally, one would expect an employer to have a "reasonable" policy because it is good business as well as a kindness to the employees to have such a policy.

signed). *Id.* For cases in which the employee is under a reasonable attendance policy and purports to be trying to keep the job, a "misconduct" analysis based on recurring negligence amounting to culpability would seem to make more sense. *Difatta–Wheaton,* 271 S.W.3d at 596–97. The issue would be whether the degree of fault amounts to sufficient culpability to warrant a denial of benefits. A misconduct analysis allows the circumstances of the absences to be considered, and the statutory presumption shifts the risk of non-persuasion to the claimant under 288.050.3.

We understand that our courts have not always been receptive to the idea that repetitive unexcused absences constitute misconduct. *See, e.g., Cubit v. Accent Mktg. Servs., LLC,* 222 S.W.3d 277 (Mo. App.2007);[5] *Williams,* 297 S.W.3d at 143 (declining to accommodate an argument based on the statutory presumption because the Commission, "as fact finder," did not base its finding on that provision).[6] But, as we have noted, to try to make a case of negligent, excessive absence into a voluntary resignation case does not seem to be open to us under the plain meaning of the word "voluntary" in the statute. And there is a significant problem with always treating absences as a resignation:

that approach does not differentiate on the basis of fault. It sweeps away the claim of the conscientious people (like the claimant in *Difatta–Wheaton* ) in the same way as it strikes at claims of the wantonly indolent. We do not think the statute was ever so designed.

### Not a Case of Voluntary Quit

█ Here, the claimant called in notification of absence before her shift each day, and when she called to check on the status of her job, she was told that she then had accumulated fifteen points and that she was terminated unless she reported in at that moment.

We assume, because the employer apparently treated all non-work-related absences the same, that this was a so-called "no-fault" attendance policy (actually more accurately called a "no excuses" policy), meaning that *all* absences for non-work-related reasons are treated the same, whether health, transportation, child care, bereavement, or other.[7] We do not know when the respective points in this case were accumulated other than on May 27 and 28.

The Commission further argues that this was a voluntary quit because Johnson had access to other means of transportation,

---

5. In that case, the employer did introduce attendance records and the attendance policy. *Cubit,* 222 S.W.3d at 281. In any event, as noted in footnote 5 in *Cubit,* the 2006 revision of the statute was not in effect during the time in question in that case. *Id.* at 283, n. 5.

6. In *Williams,* the court declined to accommodate a misconduct argument based on the presumption, saying that the Commission, "as fact finder," did not base its finding of misconduct on the presumption. 297 S.W.3d at 143. This court did not say what fact was found that precluded the argument. Ordinarily, of course, a respondent can argue that the Commission got the right result as a matter of law, and ask us to affirm, and we will,

even if the Commission employed the wrong reason in reaching the right result. *See Finner v. Americold Logistics, LLC,* 298 S.W.3d 580, 584 (Mo.App.2009).

7. This, of course, would exclude absences that employers are compelled by law to accommodate. The practice of the Division in calling absenteeism cases a "voluntary quit" may have accelerated the trend by employers to have "no excuses" policies in that the employer can be confident that absenteeism cases will result in a denial of unemployment claims because they will be called "voluntary quits," even when, in fact, that terminology is sometimes a perversion of the word "voluntary."

perhaps referring to the fact that some employees may have friends or relatives with cars or the fact that taxicabs and buses exist.[8] It is true that she was able to show up the day after her termination to pick up her paycheck. This does not prove that she had immediate transportation the day before, May 28, when told to come in "at once" to avoid being fired, and accordingly it does not prove that she was rejecting the job by *choosing* not to come in. In other words, it does not prove that she voluntarily resigned.

The argument that she "had transportation" (which may refer to an assumption as to the availability of taxicabs and buses) cannot be persuasive because our record is void of information as to the location of the plant. The argument also misses the point to the extent that it suggests that an absence of two days due to transportation difficulties, with the employee providing conscientious notification to the employer, and the failure on the second day to come in "at once" upon notification, in the absence of other information, is necessarily a *voluntary* resignation rather than a discharge. It would look like a "discharge" to any ordinary person using language in an ordinary way.

The Commission argues alternatively that even if she did *not* have other transportation, this was a voluntary quit because Johnson would not have come into work until her car was fixed. Of course, there was no evidence that her termination was based on the anticipated schedule for her car to be fixed, but was based on her accumulation of points and on her failure to come in "at that moment."[9] In any

event, this was not a case in which it was understood that it would take a certain length of time to fix her car, and in which she refused to make alternative transportation arrangements. The evidence does not show that Ms. Johnson resigned her employment.

## Misconduct

■ The Division also argues alternatively that perhaps this case could have been considered a matter of possible "misconduct," which would, if found to exist here, make Johnson ineligible to receive unemployment benefits under section 288.050.2.

> Misconduct is defined as
>
> an act of wanton or willful disregard of the employer's interest, a deliberate violation of the employer's rules, a disregard of standards of behavior which the employer has the right to expect of his or her employee, or negligence in such degree or recurrence as to manifest culpability, wrongful intent or evil design, or show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer.

Section 288.030.1(23). Whether an employee is discharged for misconduct connected with work is a question of law that we review *de novo. Williams,* 297 S.W.3d at 142.

Despite the fact that the General Assembly had amended 288.050.3, the deputy's determination in this case, which was adopted by the Commission, never discussed the issue of misconduct. Its sole

---

8. The record indicates that Ms. Johnson resided in the 7400 block of East 107th (in the southeast part of Kansas City).

9. Counsel for the Division thought Johnson said at the hearing that her car was not fixed for another week, while it appeared to us that

she meant that her car was fixed *that* Saturday. In any event, we have no reason to believe that the Commission even considered the retrospective testimony as to when the car was fixed.

finding was that Johnson's "lack of transportation was a personal matter" and that she "voluntarily left her work." Nevertheless, the employer was entitled to prove and argue before the Appeals Tribunal the issue of misconduct. It did not take significant advantage of that opportunity in that forum, but in any event, we will uphold a decision of the Commission if the Commission clearly got the right result, but for the wrong reason. *See Finner,* 298 S.W.3d at 584. Therefore, we consider the record to evaluate whether it shows that Johnson was discharged for misconduct.

■ Although absenteeism can, under 288.050.3, raise a rebuttable presumption of misconduct, absenteeism by itself is not necessarily misconduct. *Moore,* 49 S.W.3d at 739. The record in its present state is insufficient to show that Johnson was guilty of misconduct as defined in 288.030.1(23). It is obvious here that the employer did not create a "rebuttable presumption" of misconduct, because the employer did not establish that notice of the attendance policy was provided to the claimant and when the notice was provided.

### Record

The entire record of the testimony of the human resources manager, the employer's sole witness, is as follows:

\* \* \*

Q. What is the last day the claimant performed work for the employer?

A. It appears ... that it would have been May 26, 2009.

Q. What hours did she work on that date?

A. It looks like ... approximately 7 a.m. to 3:30 p.m.

Q. Why didn't she work May 27?

A. We show her attendance that she reported—she called in for personal business.

Q. Did she indicate what that personal business was?

A. If she was I can't tell by looking at this attendance record. (sic)

Q. Then what occurred?

A. That put her at 13 points. And then she subsequently called in on May 28 for personal business and that put her to 15 points which is termination on our attendance program.

Q. You know what personal business was on May 28?

A. No, I don't.

Q. What more would you like to tell me relevant to the claimant's separation from work?

A. I don't have anything [else] relevant to her separation....

\* \* \*

The hearing officer (the "referee") then asked each party whether they had "anything more that [either of them] wished to tell [her] today." Both parties declined to offer anything further.

The referee said at the start of the hearing that "misconduct" could also be an issue in the hearing. The employer, however, made no attempt to prove misconduct. Because under 288.050.3 the employer has the burden of proof on the issue of misconduct, the employer naturally would have the burden of presenting evidence to either prove misconduct or to raise the rebuttable presumption. The claimant would then, if the presumption is raised, have the risk of non-persuasion in seeking to rebut the presumption.

Perhaps the human resources manager did not have anything else "relevant to the separation" or "anything more to tell" because the manager was accustomed to the

procedure whereby all the employer had to say was that the employee was terminated for non-attendance for personal reasons, and that testimony alone would assure a ruling for the employer. The employer would be expected to know, however, that such limited information alone might not be enough, especially with regard to misconduct.

If the parties do not understand what facts are pertinent, the referee, of course, can make sufficient enquiry of the parties to determine the facts necessary to reach a conclusion. *See, e.g., Smith v. Labor & Indus. Relations Comm'n,* 656 S.W.2d 812, 817–20 (Mo.App.1983). Here, while the referee did not ask the human resources manager specific questions based on the statutory misconduct concepts, the referee did ask the employer: "What more would you like to tell me relevant to the claimant's separation?" The employer declined to present any more facts related to the policy, the absences, and the employee's knowledge of the policy. Then the employer again declined a second chance to state any facts that could either prove misconduct or raise a presumption of misconduct. Had the referee precluded an opportunity for the employer to develop a presumption of misconduct, we could consider, in fairness to the employer, remanding for further evidence. But that is not the case here.

### Summary and Conclusion

The sparse record shows that Ms. Johnson purported to want to keep her job. She called in her absences on these two days. The fact that she accumulated too many points under the attendance policy does not by itself prove that she *voluntarily resigned.* She was *discharged* for excessive points under the attendance policy. It was error to determine that she voluntarily resigned her employment.

The record discloses very little information about Ms. Johnson's absences. We know she was absent the two days of May 27 and 28, and that she claimed she could not get there. The employer did not present the facts necessary to prove misconduct or to create a presumption of misconduct pursuant to section 288.050.3. Because the record suggests this case involved a "no fault" [10] attendance policy, and because we know very little about any absences other than those on May 27 and 28 (when the claimant was absent due to transportation difficulties), the evidence was insufficient to support a finding of misconduct.

The judgment of the Commission is reversed.

**10.** If an employer has a "no fault" policy, which does not distinguish between excusable and non-excusable absence, and if the employer therefore fails to keep track of any reasons given by the employee for an absence, the employer will obviously have a more difficult time proving misconduct than it would under an attendance policy that records fault. But regardless of whether the policy is one of fault or no-fault, if the employer creates the presumption of misconduct, the success of the claimant will then obviously depend on the ability of the claimant to persuade the hearing officer that the absences were not due to the claimant's fault.