**Jose VALDEZ, Appellant,**

v.

**MVM SECURITY, INC., Defendant,**

**Division of Employment Security, Respondent.**

**No. WD 73239.**

Missouri Court of Appeals,
Western District.

Sept. 13, 2011.

452

Michael John Joshi, Lenexa, KS, for appellant.

Robert Anthony Bedell, Jefferson City, MO, for respondent.

Before Division Three: JAMES E. WELSH, P.J., JAMES M. SMART, JR., and JOSEPH M. ELLIS, JJ.

JAMES M. SMART, JR., Judge.

Jose Valdez appeals the decision of the Labor and Industrial Relations Commission ("Commission") disqualifying him from receiving unemployment compensation benefits based on a finding that he quit his job voluntarily without good cause attributable to his work or to his employer. Because we find that Mr. Valdez did not leave his employment voluntarily and because there was no contention that his discharge was for misconduct, we reverse

the decision and remand the case to the Commission.

## Factual and Procedural Background

The facts are undisputed. Jose Valdez worked as a security guard for a private security firm for eight years. In February 2009, the security company for which Valdez worked was purchased by MVM Security ("MVM"). MVM, like its predecessor, provided security services for properties belonging to the federal government. Valdez's job duties included attending the front desk of the building to which he was assigned, checking identification, and maintaining security in and around federal buildings.

His employment required him to be armed and to have a certain proficiency in the use of a firearm. Each year of his employment, Valdez was required to take and pass a shooting proficiency test. He had always passed the test in previous years from his employment in 2002 until 2010. In 2010, Valdez was notified that the federal government had raised the qualifying score for the weapons requirement to 200. Previously, a score of 180 was determined to be passing. In 2010, Valdez was allowed four attempts to qualify at the shooting range. The highest score that Valdez, then approximately sixty years of age, attained was 188. MVM discharged Valdez on June 18, 2010, after his fourth attempt was unsuccessful.

Valdez applied for unemployment benefits. MVM did not challenge his claim for benefits. The deputy with the Division of Employment Security ("Division") denied his request for unemployment benefits on the basis that he voluntarily quit his job because he failed to maintain the required firearms certification to remain employed

as a security guard. He appealed the decision. On August 31, 2010, the appeals tribunal conducted a telephone conference hearing. MVM did not participate in the hearing. Valdez was the only person who testified. Valdez testified as to his efforts to achieve the new level for the weapons requirement. After the hearing, the appeals tribunal issued its decision affirming the deputy's determination in finding that Valdez's failure to achieve the minimum qualification score on the shooting proficiency test, as required for the continuation of his employment, constituted a "voluntary quit for reasons not attributable to the job or employer," citing the provisions of section 288.050.1(1), RSMo 2000.[1] In its Findings of Fact, the appeals tribunal noted, in pertinent part:

> When the claimant was unable to achieve the minimum proficiency score at the firing range, he was discharged on June 18, 2010. The employer's contract with the federal government required that security guards qualify yearly.

In its Conclusions of Law, the appeals tribunal stated the following:

> This is a *quit case.* The issue is whether the claimant voluntarily left employment for good cause attributable to the work or the employer....

> The claimant was the only participant at the hearing. The credible evidence presented demonstrates that the claimant failed to achieve a level of qualification in the use of weapons required by the employer's contract with the federal government. The claimant was given numerous opportunities to qualify, but failed to do so. *The claimant's failure to achieve a minimum qualification*

---

1. All statutory references are to the Revised Missouri Statutes 2000, as supplemented, unless otherwise indicated.

*required for his continuation of employment was a quit for reasons not attributable to the job or the employer.* O'Neill [sic] v. Maranatha, 314 S.W.3d 779 (Mo.App.2010).

The Appeals Tribunal finds that *the claimant left his work voluntarily on June 18, 2010, for reasons not attributable to the work or the employer.*

(Emphasis added.)

Valdez appealed to the Commission which adopted and affirmed the tribunal's decision. Valdez appeals.

Valdez raises two points on appeal. In his first point, he contends that the Commission erred in denying him unemployment benefits based on a finding that he voluntarily left his work without good cause attributable to his employment. Because we find this point dispositive, it is not necessary to address the allegations of error raised in his second point.

## Standard of Review

Appellate review of a decision made by the Labor and Industrial Relations Commission is governed by section 288.210, RSMo. *Dixon v. Stoam Indus., Inc.,* 216 S.W.3d 688, 692 (Mo.App.2007). This court may reverse, remand, or set aside the decision of the Commission only where the Commission: 1) acted without or in excess of its powers; 2) the decision was procured by fraud; 3) the decision is not supported by the facts; or 4) the decision is not supported by sufficient competent evidence in the record. § 288.210; *Ayers v. Sylvia Thompson Residence Ctr.,* 211 S.W.3d 195, 197–98 (Mo.App.2007). In reviewing the Commission's decision, we are not bound by the Commission's conclusions of law or its application of the law to the facts. *Difatta–Wheaton v. Dolphin Capital Corp.,* 271 S.W.3d 594, 595 (Mo. banc 2008). Where the facts are undisputed and the issue is the construction and application of a statute, then the issue is one of law that we review *de novo. Robinson v. Courtyard Mgmt. Corp.,* 329 S.W.3d 736, 739 (Mo.App.2011).

We examine the whole record to determine whether there is competent and substantial evidence to support the Commission's decision and whether the decision was contrary to the overwhelming weight of the evidence. *Johnson v. Div. of Emp't Sec.,* 318 S.W.3d 797, 799 (Mo.App. 2010); *Taylor v. Div. of Emp't Sec.,* 153 S.W.3d 878, 881 (Mo.App.2005). The Commission's determination of whether an employee voluntarily left his employment or was discharged is ordinarily essentially a factual determination. *Lindsey v. Univ. of Mo., Div. of Emp't Sec.,* 254 S.W.3d 168, 171 (Mo.App.2008). In reviewing the factual findings, this court is to determine whether the Commission, based upon the whole record, could have reasonably made its findings and reached its result. *Id.* The factual findings of the Commission must be supported by substantial and competent evidence in the record. *See Sokol v. Labor & Indus. Relations Comm'n of Mo.,* 946 S.W.2d 20, 24 (Mo.App.1997).

Where the findings of the Commission involve the interpretation or application of the law, as distinguished from a factual determination, it is not binding on this court and therefore falls within our province of review and correction. *Ross v. Whelan Sec. Co.,* 195 S.W.3d 559, 563 (Mo. App.2006). "Moreover, where the Commission's finding of ultimate fact is reached by the application of rules of law instead of by a process of natural reasoning from the facts alone, it is a conclusion of law and subject to our reversal." *Id.* (citation omitted). This court is not bound by the Commission's conclusions of law or its application of law to the facts, and questions of law are reviewed independent-

ly. *Shelby v. Hayward Baker, Inc.*, 128 S.W.3d 164, 165–66 (Mo.App.2004). Here, the Commission ruled that although Valdez was "discharged," it was nevertheless a "voluntary quit case." Because there is in actuality no dispute concerning the facts, we review the ruling to determine whether it was a misapplication or misinterpretation of law.

### The Employment Security Law

Section 288.020 states the purposes of the Employment Security Law:

1. As a guide to the interpretation and application of this law, the public policy of this state is declared to be as follows: Economic insecurity due to unemployment is a serious menace to health, morals, and welfare of the people of this state resulting in a public calamity. The legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this state require the enactment of this measure, under the police powers of the state, for compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.

2. This law shall be liberally construed to accomplish its purpose to promote employment security both by increasing opportunities for jobs through the maintenance of a system of public employment offices and by providing for the payment of compensation to individuals in respect to their unemployment.

■ In construing provisions under Chapter 288, the goal of this court is to "ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider words used in the statute in their plain and ordinary meaning." *Ross*, 195 S.W.3d at 564 (citation omitted). "Courts should liberally construe the law to meet that goal."

*Id.* (quoting *Campbell v. Labor & Indust. Relations Comm'n*, 907 S.W.2d 246, 249 (Mo.App.1995)). Of course, we do not look only at the overall purpose of the legislative scheme, but also at the details of the qualification statutes in context.

■ The issue in a case such as this is whether the claimant Valdez left his work voluntarily without good cause attributable to his work or employer pursuant to section 288.050.1(1). As to the initial issue—whether the termination was a voluntary termination—we review the factual findings of the Commission to see whether those findings indicate that the termination can, as a matter of law, be considered to constitute a voluntary departure from employment. *Johnson*, 318 S.W.3d at 799. Our review is *de novo. Id.*

■ The claimant has the burden to prove eligibility for benefits. *Taylor*, 153 S.W.3d at 881. The disqualifying provisions of section 288.050 are to be strictly and narrowly construed in favor of finding an employee to be entitled to compensation. *Ross*, 195 S.W.3d at 565. In interpreting this statute, Missouri courts "have required that an employee not have caused his dismissal by his wrongful action or inaction or his choosing not to be employed." *Id.* (quoting *Ford v. Labor & Indus. Relations Comm'n*, 841 S.W.2d 255, 257 (Mo.App.1992)).

■ The plain language of the statute excluding eligibility for unemployment benefits applies to a claimant who leaves work "voluntarily" without "good cause," while allowing benefits for employees who voluntarily leave work for "good cause" attributable to their employment. Therefore, it follows that employees who are *discharged* by the employer and leave work *involuntarily* (for reasons other than misconduct) would not thereby be disqualified from receiving unemployment benefits

under the statute. When an employer claims an employee voluntarily left his or her employment without good cause attributable to the employer, it is the employee's burden to prove that is not the case. *Sokol*, 946 S.W.2d at 23. This may be done by showing that the employee left work for good cause attributable to the work or the employer, or by the employee showing that he or she *did not leave work voluntarily but was discharged. Taylor*, 153 S.W.3d at 881 (emphasis added).

## Analysis

■■■ After examining the record in this case, we observe that the dispositive issue to be determined is whether Valdez's termination from his employment with MVM constituted a "voluntary quit" in light of the particular facts of this case and within the statutory provisions of section 288.050.1(1).[2]

Under section 288.050.1(1), the phrase "left work voluntarily," actually means "left *employment* voluntarily," or "voluntarily quit employment." *Johnson*, 318 S.W.3d at 800. The phrase "leaving work" in the statute does not refer to an employee ducking out early before the end of the work day, but refers to an employee resigning from a position or abandoning or "quitting" his job. It is, in essence, "leaving" the *job. Id.* Even if we sometimes have used the term "voluntary quit" to refer to a voluntary act of the claimant that the claimant knew or should have known would necessitate that he or she be discharged, *see Board of Educ. of City of St. Louis v. Labor & Indus. Relations Comm'n*, 633 S.W.2d 126, 133 (Mo.App. 1982), such instances are usually better

analyzed as cases of "misconduct." *See, e.g., Johnson*, 318 S.W.3d at 805–06; *Moore v. Swisher Mower & Machine Co., Inc.*, 49 S.W.3d 731, 737–40 (Mo.App.2001). It accords with legislative intent to let the words actually have their ordinary meanings. Section 1.090 ("Words and phrases shall be taken in their plain or ordinary and usual sense, but technical words and phrases having a peculiar and appropriate meaning in law shall be understood according to their technical import."). This would tend to mean that if a reasonable claimant is stunned to be told that the termination was a *"voluntary quit"* when the claimant saw nothing voluntary about it, it probably is not a "voluntary quit." *Difatta–Wheaton*, 271 S.W.3d at 596–98.

■■■ "An employee is deemed to have left work voluntarily when he leaves of his own accord, as opposed to being discharged, dismissed, or subjected to layoff by the employer." *Lindsey*, 254 S.W.3d at 171 (quoting *Miller v. Help at Home, Inc.*, 186 S.W.3d 801, 806 (Mo.App. 2006)). The plain meaning of the term "voluntarily," in this context, means "proceeding from the will: produced in or by act of choice." *Difatta–Wheaton*, 271 S.W.3d at 598. A claimant leaves work voluntarily when he leaves of his own volition. *Shields v. Proctor & Gamble Paper Prods. Co.*, 164 S.W.3d 540, 543 (Mo.App. 2005).

In *Difatta–Wheaton*, the Supreme Court considered a claim filed by a worker who did not return from her scheduled leave from work on the day her leave expired. She was absent due to her emergency medical condition (sudden excessive bleeding due to ovarian cancer), and while at-

---

**2.** Analysis of the claim is a three-part inquiry. *See Difatta–Wheaton*, 271 S.W.3d at 596. The first determination is whether a claimant quit voluntarily. *Id.* The second determination is whether a claimant who quit voluntarily had good cause for doing so. *Id.* Finally, if the quit was voluntary and with good cause, the court analyzes whether the cause was attributable to the work or the employer. *Id.*

tending to the medical complications resulting from her cancer, she took pains to notify her employer of the problem in order to try to preserve her employment. 271 S.W.3d at 595. After considering the meaning of the statutory words "voluntarily" and "fault," the Court stated:

> It cannot be said that [the claimant] made a choice or was otherwise responsible for her ovarian cancer, its complications, or the timing of their occurrence. And, she took the steps necessary to preserve her employment given these uncontrollable factors. It would be inconsistent with the statutory language of "no fault" and "voluntarily" to hold otherwise.

*Id.* at 599.

Helpful concepts in considering voluntariness generally are the concepts of *"choice"* and *"volition,"* which in turn can include the concept of "fault" (which is the issue of whether the claimant acted irresponsibly or in an otherwise deficient manner). *See Board of Educ.,* 633 S.W.2d at 133. Here, the Division claims the Commission properly determined that Valdez voluntarily quit work because he failed to pass the necessary firearms proficiency test to allow his employer to continue to employ him. The Division does not argue that he "made a choice," or that he was "irresponsible" in any sense of that word involving culpability or the ability to control the circumstances. The Division concedes that Valdez's actions were not "voluntary" in the ordinary sense that he did not intentionally fail the weapons proficiency test in order to leave his employment. The Division does not accuse him of bad faith. Yet the Division wishes to have us rule that his actions were "voluntary" in some other mysterious sense for which we can find no root in the statutory concepts.

The Division concedes that Valdez made several good faith attempts to qualify in order to keep his job, and yet the Division, in essence, asks us to determine that the blame for the job loss goes to Valdez. When the Division says that it was "his [Valdez's] *responsibility* " to pass the test, it forgets that when Valdez was hired, he knew nothing about the firearms requirement being tightened in 2010, requiring him to score better than 200 (instead of 180) on the firearms qualification test. There are lots of things that were "his responsibility," and he evidently did them well enough for eight years to keep his employer content. Is the Division suggesting that every time an established employee faces the challenge of a *new* responsibility, and fails in fulfilling that responsibility, despite best efforts, and thereby suffers the loss of the job, it is necessarily a "voluntary quit"? If the Division is so suggesting, we must disagree.

The Division seems to be confusing the issue of whether the employer had the right to terminate Valdez (and it clearly did) with the issue of whether Valdez can be said to have quit his job voluntarily. In support of its position, the Division cites as authority *Board of Education,* 633 S.W.2d 126, and *O'Neal v. Maranatha Village Inc.,* 314 S.W.3d 779 (Mo.App.2010), two cases that did involve issues of choice and responsibility on the part of an employee but are distinguishable from this case.

In *Board of Education,* a substitute teacher with a temporary teaching certificate was hired. She, and the school district, knew that she would not be able to continue beyond the time prescribed on her temporary certificate unless she somehow managed to qualify for a permanent certificate.[3] She was allowed to teach for

---

**3.** The opinion in the case is not clear as to whether the claimant had the practical ability

to get the certificate prior to the expiration of her temporary certificate. We assume that

45 days without the permanent certificate. 633 S.W.2d at 127. At the end of the 45–day term, the teacher had not completed the requirements to obtain the certificate. The State Board of Education ("Board") granted the teacher a 45–day extension of her temporary certificate. *Id.* At the end of the 90 days, the teacher, who still had not obtained her permanent certificate, was prohibited from continuing to teach in a public school by state law, even though she desired to continue teaching and the school district was still in need of her services. *Id.* The teacher sought unemployment benefits. The Board contested the teacher's claim for benefits, citing the fact that she was not eligible under state rules to teach longer than she did because she had only a temporary teaching certificate, and further citing the fact that she had not reapplied for the following school year or completed the educational coursework necessary for a permanent teaching certificate. *Id.* at 127–28. The deputy's decision granted benefits. *Id.* at 128. The appeals tribunal and the Commission affirmed.

The Board of Education appealed. In reversing the Commission's decision on appeal, the circuit court held that the teacher had "voluntarily" left work because she was aware when she began teaching that she would be unemployed after the expiration of the time allowed unless she completed requirements for a permanent certificate. *Id.* The claimant took the job knowing that the job was temporary and that her ability to retain the job was conditional. The court thus considered her termination to be "voluntary" because, in a sense, she chose to take a short-term job

that had a definite short-term end date if she could not obtain a permanent certificate. *Id.*

The teacher appealed the decision of the circuit court. The reviewing court agreed with the circuit court's decision in determining that the employee left work voluntarily because she was "fully aware that she would be unemployed when the 45–day certificate and its extension expired." *Id.* at 133. The court held that there was "no question that [the claimant] *exercised a free-will choice and control as to the consequences of her actions,* and that her leaving was therefore voluntary." *Id.* (emphasis added).

*Board of Education* is clearly distinguishable from the circumstances in the present case. The fact that Valdez had worked in the same capacity for approximately eight years, had qualified every year, and did everything he could to qualify in 2010, makes this case distinguishable. When hired, Valdez knew that he had to annually qualify on the firearms test, but neither he nor his employer knew that eight years later the firearms qualification requirement would be tightened. In the eyes of both Valdez and his employer, he had a so-called "permanent" job of indefinite employment, threatened only by the change in 2010 of the firearms requirement. The employer, by not opposing his claim for benefits, presumably believed that Valdez did not choose to voluntarily quit.[4]

*O'Neal,* the other case relied upon by the Division, is similar to *Board of Education* in that there the claimant also knew the job had a short-term end date if she

---

she did, but whether or not she had the ability to accomplish that goal, she knew exactly the limitations on the job continuation when she took the position. *Id.* at 126.

4. Valdez makes no argument that because the employer decided not to contest the claim the Division was required to honor it. Accordingly, we do not address the independent authority of the Division to deny benefits when the employer does not contest the claim.

did not complete the requirements to become certified as a nursing assistant. The claimant was terminated within four months for failing to become certified. *O'Neal*, 314 S.W.3d at 781. She was notified when she was hired that she had 120 days in accordance with the state regulations in order to become a certified nursing assistant. *Id.* at 782. After failing to gain her certification and being discharged, the claimant applied for unemployment benefits. *Id.* The employer contested the claim for benefits on the basis that claimant had not completed the educational coursework for certification and had failed one of the exams. *Id.* at 783. Her claim was denied, and the denial was upheld. *Id.*

*O'Neal* is distinguishable from the present case for essentially the same reasons as the *Board of Education* case. Valdez's job was not seen by anyone as a contingent, temporary job. He knew the firearms qualification was an ongoing contingency, but neither he nor his employer anticipated that he would at some point have trouble qualifying. No one argued that Valdez was lazy and made no effort to practice his shooting skills,[5] or did not show up for the test, or that he intentionally failed the test so that he could stay home. Unlike the claimants in *Board of Education* and *O'Neal*, we cannot see that Valdez made any "choice" that affects his qualification for benefits. Valdez did not choose a job he knew would be temporary unless he promptly met some contingency. No one has put forth a theory of any irresponsible behavior on the part of Valdez.

We understand that there is a surface similarity between the cases cited by the Division and this case in that each involved the requirement of an outside entity that some accomplishment or certification be attained. Beyond that, the similarities are non-existent for purposes of the Employment Security Law. The essential statutory concepts of volition and choice relating to the factors affecting job retention are not present in the facts of this case as they were in the cases cited.

The Division cites no authority beyond *Board of Education* and *O'Neal* to support a determination that this was a voluntary termination case. We are unfamiliar with any general principle that whenever a regulatory or contracting entity separate from the employer imposes a requirement or changes some requirement or circumstance affecting the employment, resulting in the loss of the claimant's position, the worker must be deemed to have "voluntarily" quit. We are familiar, however, with cases that have awarded compensation for the loss of employment when the employee, due to circumstances beyond the employee's control, has lost a position. *See, e.g., Davis v. Transp. Sec. & Div. of Emp't. Sec.*, 295 S.W.3d 594 (Mo.App. 2009); *Korkutovic v. Gamel Co.*, 284 S.W.3d 653 (Mo.App.2009).

Valdez presented sufficient evidence that he was discharged involuntarily. The Commission's decision that Valdez voluntarily terminated his employment was not supported by the evidence and was a misapplication of law. Point I is granted.

5. Valdez informed the Division in his appeal that he had spent several hundred dollars in shooting range fees, ammunition, and targets to prepare for the test. Under the Division's analysis of voluntariness, such facts are entirely irrelevant. The Commission found it unnecessary to believe or disbelieve this assertion. Of course, if there were evidence that Valdez was irresponsible in failing to prepare for the test, the Division apparently would not find *that* evidence irrelevant. We note this statement by Valdez only to mention that no one suggests that Valdez did not act responsibly in trying to keep his job.

Because of our ruling as to Point I, Valdez's Point II is moot.[6]

### Conclusion

For the foregoing reasons, we reverse the Commission's decision denying Valdez's unemployment benefits on the basis that he quit work voluntarily. We remand to the Commission for further proceedings.

All concur.

---

6. Because we determine that this case did not involve a "voluntary termination," we do not address the issue of whether Valdez had "good cause" related to the work.