Deidra WAGGONER, Appellant,

v.

OZARK ANESTHESIA ASSOCIATES, INC., and Missouri Division of Employment Security, Respondents.

No. SD 31074.

Missouri Court of Appeals,
Southern District,
Division Two.

March 26, 2012.

Motion for Rehearing and Transfer
Denied April 17, 2012.

Application for Transfer
Denied May 29, 2012.

Erica Mynarich, Joplin, MO, for Appellant.

James E. Meadows, Springfield, MO, for Respondent Ozark Anesthesia.

Ninion S. Riley, Jefferson City, MO, for Respondent Division of Employment Security.

WILLIAM W. FRANCIS, JR., Presiding Judge.

Deidra Waggoner ("Waggoner") appeals the decision of the Labor and Industrial Relations Commission ("Commission") disqualifying her from unemployment benefits because she left work voluntarily. We reverse the Commission's decision and remand for further proceedings.

### Facts and Procedural History

Waggoner was employed with Ozark Anesthesia Associates, Inc. ("OAA"), for approximately six-and-a-half years. At the beginning of May 2010, Waggoner's 20–year–old son told her that he was addicted to Oxycontin. On May 4, 2010, Waggoner informed Nancy Grace ("Grace"), OAA's office manager and Waggoner's direct supervisor, that her son would need to enter a detoxification program and that after he completed the inpatient program, he would be placed into a rehabilitation facility as soon as possible.

Waggoner's son received inpatient treatment from May 5, 2010 to May 8, 2010.[1] Waggoner testified someone at the inpatient facility told her that her son would need constant supervision after leaving the facility, until he could be placed into a rehab facility, because he might relapse if he was not monitored. The son's discharge from the inpatient facility did not mention the need for supervision during his transition.

On May 10, 2010, while at work, Waggoner spoke with OAA's administrator, LaDonna O'Brien ("O'Brien"). Waggoner explained to O'Brien her son's situation and that she anticipated needing time off to

---

1. Waggoner did not miss work during this  period.

care for him. At the time, Waggoner only had one sick day available and had already used all of her accrued vacation days.[2] Waggoner inquired if her absences could be covered under the Family and Medical Leave Act ("FMLA"). O'Brien told Waggoner she was not sure, it would depend on her son's condition, but that she would call their attorney to get the paperwork and it would be available for Waggoner the next day.

On May 11, 2010, Waggoner left work at 9:30 a.m., to take her son to the dentist. Thereafter, Waggoner called Grace to say she would miss the rest of the day because her husband could not monitor their son. O'Brien was not aware of Waggoner's absence until later in the afternoon when she attempted to deliver the FMLA paperwork to Waggoner.

On May 12, 2010, O'Brien spoke with Waggoner by phone and told her that the FMLA paperwork—U.S. Department of Labor ("DOL") form WH–380 (Certification of Health Care Provider for Employee's Serious Health Condition)—had been available to her on May 11 and she needed to pick it up and have a physician complete the paperwork showing a need for Waggoner to be absent from work or "she would be out of a job for missing work."

Waggoner missed five days—May 11, 12, 13, 14 and 17—while her son was out of the hospital and awaiting placement into a rehabilitation center. Waggoner then missed four additional days—May 18, 19, 20 and 21—because of problems with her elbow; she provided Grace with a doctor's excuse for the days missed due to her elbow. Grace testified that after talking with Waggoner on Wednesday, May 12, she did not hear from Waggoner again until Tuesday, May 18. Grace testified she called Waggoner on May 18 and left a message for Waggoner to call her. On May 19, after hours, Waggoner called and left a message for Grace. Grace testified she received Waggoner's message on the morning of the 20th, the day she expected Waggoner to return to work. Waggoner's voicemail message stated Waggoner had been to the doctor and was going to be on leave a few days due to problems with her elbow. Grace testified she did not approve the personal sick leave.

On May 24, 2010, when Waggoner returned to work, she submitted FMLA paperwork signed by a physician's assistant at her son's primary care clinic on Lamar University letterhead—this was not the DOL approved WH–380 form provided by O'Brien. OAA rejected the paperwork as it was not fully completed and not on the approved DOL form. O'Brien provided Waggoner with another DOL WH–380 form and Waggoner was told to cure the defects by the next day.[3]

On May 25, 2010, between 2:29 p.m. and 5:30 p.m., two faxes were transmitted to OAA containing a new FMLA form signed by Dr. Timothy L. Jones ("Dr. Jones"), a fill-in physician at the son's primary care clinic.[4] In the portion of the statement completed by Waggoner, she indicated her son needed to be monitored "24–7." In the portion completed by the health care provider, Dr. Jones indicated the duration of the son's condition was one to two months. Dr. Jones further explained that

---

**2.** O'Brien testified regarding OAA's policies for sick leave and vacation days allocated to OAA employees per year.

**3.** OAA's demand to Waggoner is contrary to the established FMLA process in that an employer must provide an employee with seven calendar days to cure such deficiencies. *See*

29 C.F.R. § 825.305(c). The issues presented by the parties do not concern this misinformation by OAA.

**4.** The treating physician had left the clinic and the doctor at the detoxification center declined to sign the form.

it was medically necessary for Waggoner to help care for her son because he needed "[h]elp with support keeping her son off drugs and help for long term treatment [and] success."

That same day, O'Brien and Grace met with Waggoner. Waggoner was told that the certification would be reviewed and if it did not satisfy FMLA requirements, she would be terminated. Waggoner asked if she could "take vacation leave or a leave of absence" to work on the FMLA certification. O'Brien told Waggoner she could not take a leave of absence because there were already too many employees absent; OAA was "very short-handed." O'Brien testified that when Waggoner was told she could not have a leave of absence and she did not have any vacation leave available, Waggoner walked out of the meeting, slammed the door, packed up all of her belongings, and left the office. O'Brien and Grace both testified no one told Waggoner she was fired. Waggoner, however, testified that in the meeting on May 25, O'Brien told her she was fired.

On May 26, 2010, O'Brien called Waggoner and asked her to come in and pick up a letter. O'Brien testified Waggoner asked whether she still had a job and O'Brien told Waggoner she did. The letter stated that the FMLA certification failed to meet the FMLA requirements. The letter explained in part that the information contained in the certification was "vague, ambiguous and lacks information sufficient for us to determine your absence will be for an FMLA protected reason." The letter also stated that, "[t]he parameters for your leave to take care of your son are not delineated." The letter granted Waggoner seven days to provide adequate certification. The extension expired on June 2, 2010. Additionally, the letter stated that Waggoner's "continued employment with OAA was contingent upon

[Waggoner's] absences thus far being designated as FMLA leave."

After May 26, 2010, Grace did not hear directly from Waggoner—Waggoner did not work on May 26, 27 and 28, or June 1 and 2. Waggoner continued to receive her salary and benefits.

Sometime between May 25 and June 2, Waggoner spoke with Dr. Jones and explained the problem to him but he said there was nothing that he could add or change on the documentation. This prompted Dr. Jones to call O'Brien to try and find out what else he could do to complete the paperwork. On June 2, 2010, Waggoner mailed to OAA the same FMLA certification signed by Dr. Jones' that she had previously submitted on May 25, 2010.

On June 3, 2010, attorneys for OAA sent Waggoner a letter stating she was terminated from employment effective June 2, 2010, for extended, unauthorized absences. The letter stated that "[e]xcept for two days [May 24 and 25], you were continually absent from your job, since May 11, 2010, without authorization or leave." It explained that during this period Waggoner "failed to communicate with the appropriate personnel to advise them of your continuing absence, and most days, your supervisors simply received no communication from you."

Waggoner testified she "was in constant communication with [Grace] which is what I was informed I needed to do...." Waggoner submitted cell phone records showing she called OAA on May 6, 11, 12, 18, and twice on May 19. Waggoner testified that the cell phone records did not show all the times she called OAA, just those made from her cell phone. Waggoner also submitted a printout of an email she testified she sent to O'Brien's assistant after it was returned to her due to having O'Brien's wrong email address.

O'Brien testified she talked with Waggoner on May 10 and 12, but did not talk to her again until May 24. O'Brien testified she never received an email from Waggoner, nor did either of her assistants. Grace said she did not recall providing Waggoner with anything in writing, i.e., employee handbook or manual, on how to handle sick leave, vacation time, or FMLA leave.

On June 16, 2010, Waggoner filed a claim for unemployment benefits with the Missouri Division of Employment Security ("Division"). OAA protested the claim. The Division determined that Waggoner was disqualified from receiving unemployment benefits because she left work voluntarily on June 2, 2010, without good cause attributable to her work at OAA. Waggoner appealed the deputy's determination. After an administrative hearing, the Appeals Tribunal ("Tribunal") affirmed the Division's determination. The Tribunal's decision held in part as follows:

> By May 25, 2010, the claimant had not provided a medical report to support her claim for time off under the [FMLA].... The claimant was given until June 2, 2010, to provide a document from a treating physician indicating it was required that she be off work due to her son's situation. The claimant did not provide such medical report by June 2, 2010.
>
> ....
>
> Inasmuch as the claimant was given until June 2, 2010, to provide a required medical report to support her claim for leave under the [FMLA] and did not provide such report, it is concluded that she left her work voluntarily.

Waggoner appealed the Tribunal's decision to the Commission. The Commission affirmed and adopted the Tribunal's decision. This appeal followed.

Waggoner's first point argues the Commission erred in ruling Waggoner was not terminated, but rather voluntarily quit her employment by failing to provide the requisite FMLA paperwork. Waggoner's second point alleges the Commission erred in ruling that Waggoner voluntarily quit her employment without good cause by failing to provide a proper FMLA certification because OAA demanded more of Waggoner than required by FMLA. The primary issue for resolution is whether the Commission erred in finding Waggoner voluntarily left her employment.

## Standard of Review

■■■ This Court may modify, reverse, remand for rehearing, or set aside the decision of the Commission on the following grounds and no others:

> (1) That the Commission acted without or in excess of its powers;
>
> (2) That the decision was procured by fraud;
>
> (3) That the facts found by the Commission do not support the award; or
>
> (4) That there was no sufficient competent evidence in the record to warrant the making of the award.

§ 288.210 RSMo 2000.[5] "Thus, we will affirm the Commission's decision if upon review of the whole record, we find that there is substantial and competent evidence to support it." *Miller v. Help at Home, Inc.*, 186 S.W.3d 801, 805 (Mo.App. W.D.2006). While this Court defers to the Commission's factual findings, we are not bound by the Commission's conclusions of law or its application of the law to the facts. *Id.*

■■■ Whether an employee voluntarily left his or her employment, or was discharged, is a factual determination; however, "the standard of review is *de novo* when the issue is whether the facts found

---

**5.** All references to statutes are to RSMo Cum. Supp.2006, unless otherwise indicated.

by the Commission can, as a matter of law, be considered to constitute a voluntary departure from employment." *Johnson v. Division of Employment Sec.*, 318 S.W.3d 797, 799 (Mo.App. W.D.2010) (internal citation omitted). "Similarly, when the issue is whether the claimant was guilty of 'misconduct,' the standard of review is *de novo* as to whether the facts found by the Commission constitute misconduct." *Id.*

## Analysis

First, Waggoner argues that the Commission erred in ruling that Waggoner was not terminated, but rather voluntarily quit her employment by failing to provide the required FMLA paperwork. We agree.

■ Under section 288.050, a claimant shall be disqualified from receiving unemployment benefits if the claimant: (1) "has left work voluntarily without good cause attributable to such work or to the claimant's employer[ ]"; or (2) "has been discharged for misconduct connected with the claimant's work[.]" §§ 288.050.1(1) and 288.050.2. "[T]he language of section 288.050.1(1), like the other disqualifying provisions of Missouri's employment security law, 'must be strictly and narrowly construed in favor of finding that an employee is entitled to compensation.'" *Harris v. Division of Employment Sec.*, 350 S.W.3d 35, 40 (Mo.App. W.D.2011).

■ The concept of "voluntary quit" should be "reserved for those cases in which the employee not only does not show up, but also impliedly rejects the employment and the employer by some action

such as failing to provide notification of the absence."[6] *Johnson*, 318 S.W.3d at 804. It is difficult to apply the phrase "left work voluntarily" where "the employee has conscientiously provided notice of the absence, purports *to want* to be at work, and claims constraint from attendance by circumstances such as sickness or some other difficulty." *Id.* at 801.

An employee leaves work voluntarily when she leaves of her own accord, rather than being dismissed, discharged, or subjected to layoff by the employer. Conversely, we will not deem a claimant to have left work voluntarily when the employer decides to end the employment relationship. We will not conclude that a claimant left work voluntarily when the employer obviously discharged the employee for failing to comply with a work rule.

*Robinson v. Courtyard Mgmt. Corp.*, 329 S.W.3d 736, 739 (Mo.App. E.D.2011).

■ Here, the record contains insufficient evidence to support the Commission's conclusion that Waggoner voluntarily left her employment. The Commission found that Waggoner was absent from work after May 11, 2010, "to attempt to facilitate drug rehabilitation for her 20 year old son," returned to work on May 24, 2010, and also worked on May 25. The Commission specifically concluded that Waggoner left work voluntarily because she was given until June 2 to provide a medical report to support her claim, and failed to do so. While Waggoner did not submit the required FMLA paperwork,[7] Waggoner's ac-

---

6. Since our Supreme Court's ruling in *Difatta–Wheaton v. Dolphin Capital Corp.*, 271 S.W.3d 594 (Mo. banc 2008), Missouri courts have generally rejected the formerly accepted practice by the Division of regarding absences as always involving a voluntary resignation, and instead consider whether the claimant's actions effectively express an intentional rejection of the job. *See Johnson*, 318 S.W.3d at 803.

7. Waggoner also alleges error in the Commission's interpretation and application of the FMLA; we, however, find this argument unpersuasive and moot as to the dispositive issue of whether Waggoner voluntarily quit or was discharged. We express no opinion as to whether these facts compel application of FMLA.

tions during this time period do not show she left OAA on her own accord; rather, her actions, summarized below, indicate she had a desire to keep her job and affirmatively sought to retain it.

■ At the beginning of May, Waggoner took the initiative to ask O'Brien whether her absences could be covered under FMLA. O'Brien told Waggoner it would depend on her son's condition and would require completed FMLA papers showing a need for Waggoner to be absent from work. O'Brien was clear that Waggoner's employment would be terminated unless her absences qualified under FMLA.[8] At the very least, Waggoner called OAA periodically during her absence to apprise them of the situation. There is also evidence that she made multiple attempts to obtain the required FMLA paperwork from various physicians and health care providers. Additionally, she returned to work on May 24 and 25. During the meeting with O'Brien and Grace on May 25, Waggoner asked if she could take vacation leave or a leave of absence to work on the FMLA certification, again indicating her desire to retain her employment. She was again told that if her FMLA certification did not satisfy FMLA requirements, she would be terminated. Finally, after Waggoner was granted seven additional days to provide the required FMLA paperwork, the record shows she again attempted to cure the defects by talking to Dr. Jones. Although Dr. Jones explained he was unable to add or change any of the documen-

tation, Waggoner, in an effort to retain her job, on June 2 again sent Dr. Jones' certification to OAA. Because Waggoner's actions show she made reasonable efforts to maintain her employment, but OAA chose to terminate her when it did not receive the required FMLA paperwork on June 2, we find Waggoner was discharged and did not voluntarily leave work. *See Harris,* 350 S.W.3d at 41 (finding claimant did not voluntarily leave and employer chose to discharge claimant when it did not receive the updated paperwork after claimant made repeated attempts to cure deficiencies in her medical paperwork by keeping in contact with the doctor's office and her human resources contact and sending a new set of paperwork to doctor's office to be returned to employer).

The record before us also demonstrates confusion arising out of the misinformation OAA conveyed to Waggoner. There is no dispute that Waggoner was initially told after submitting insufficient paperwork on May 24 that she had to cure the defects by the very next day. While there is conflicting evidence regarding what OAA said during the May 25 meeting and Waggoner's subsequent actions, it is undisputed that on May 26 O'Brien told Waggoner that she still had a job and gave her until June 2 to submit the completed FMLA certification. We cannot conclude Waggoner voluntarily quit in the face of this misinformation about what was required of Waggoner in light of her continued attempts to satisfy OAA's demands as to the FMLA certification.[9] The Commission's

---

8. "[A]n employer's characterization of a separation from employment as a discharge or voluntary quit may be instructive, but it is not dispositive." *Williams v. Dutchtown Care Ctr., Inc.,* 313 S.W.3d 690, 693 n. 2 (Mo.App. E.D.2010).

9. For cases in which the employee is under a reasonable attendance policy and purports to be trying to keep the job, a "misconduct" analysis based on recurring negligence

amounting to culpability would seem to make more sense. *Difatta–Wheaton,* 271 S.W.3d at 596–97. The issue would be whether the degree of fault amounts to sufficient culpability to warrant a denial of benefits. A misconduct analysis allows the circumstances of the absences to be considered, and the statutory presumption shifts the risk of non-persuasion to the claimant under [section] 288.050.3.

*Johnson,* 318 S.W.3d at 805.

finding that Waggoner voluntarily quit is reversed.[10]

Because the Commission erroneously found Waggoner was not discharged, but rather voluntarily quit, the Commission did not make definitive findings regarding whether she was discharged for misconduct connected with work. Nevertheless, the issue of whether Waggoner was discharged for misconduct connected with work was also before the Commission and disputed evidence as to this issue was heard at the administrative hearing. The parties agree, as do we, that the Commission's findings of fact and conclusions of law are lacking on this issue. We find the Commission's findings are inadequate to conduct a meaningful review of whether OAA met its burden of proving Waggoner willfully violated OAA's rules or standards. *See Williams*, 313 S.W.3d 690, 693. Thus, we remand to the Commission for further findings of fact and conclusions of law on the issue of misconduct connected with work.

BARNEY and SCOTT, JJ., Concur.

---

10. Because we reverse and remand on the basis that the Commission erred in holding that Waggoner voluntarily left her employment, we need not address Waggoner's second point alleging error in the Commission's finding that Waggoner voluntarily quit her employment without good cause.