

# In the Missouri Court of Appeals Eastern District

## DIVISION THREE

KYESHA MICKLES,

    Appellant,

vs.

MAXI BEAUTY SUPPLY, INC. and
DIVISION OF EMPLOYMENT
SECURITY,

    Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)

No. ED106696

Appeal from the Labor and Industrial
Relations Commission
2021743

Filed: January 29, 2019

## OPINION

Kyesha Mickles appeals the decision of the Labor and Industrial Relations Commission (the Commission) disqualifying her from unemployment benefits because she voluntarily quit her job at Maxi Beauty Supply, Inc. (Employer) without good cause. Mickles argues that the Commission erred because she had good cause to quit. Because we find that Mickles had good cause to quit, we hold that the Commission erred when it determined that Mickles quit without good cause, which is a question of law we review *de novo*. *Darr v. Roberts Mktg. Grp., LLC*, 428 S.W.3d 717, 719 (Mo.App.E.D. 2014). Consequently, we reverse and remand with directions to award Mickles unemployment benefits.

## Factual and Procedural Background

Mickles, a licensed cosmetologist with a bachelor's degree in business management, began working at one of Employer's beauty stores in January of 2015 as a salesperson. By early 2017, she had become store manager at Employer's Hazelwood, Missouri location, and her rate of pay was $11.25 an hour. She also earned commissions for eyelash services she performed at the store. However, in March 2017, Employer discontinued the eyelash service, and Mickles lost that source of income.

At that time, Mickles was pregnant with less than two months before the birth of her first child, so she asked Employer whether there were work opportunities within the company to make up for the lost income. In fact, she told Employer she may not be able to continue working for the company after her maternity leave without an increase in her income due to her family's increased economic needs.

Employer initially declined to address Mickles's request. However, a few months later, Employer offered to make Mickles the company's general manager and human resources director, a position for which she would be paid $12.50 an hour and would be responsible for hiring, firing, scheduling, managing social media, creating job descriptions and a filing system, and settling disputes between employees. Mickles would have the keys to three of Employer's five stores, and would be "on call" to Employer at all times. She would also be permitted to bring her child to work with her, which saved her childcare expenses.

Mickles accepted the new position when she returned from maternity leave in early summer 2017. Over the course of the next few months, she worked 20 to 35 hours a week in the position, averaging about 24 hours per week. There is no indication that Employer was dissatisfied with her work performance. However, on September 17, 2017, Employer sent Mickles a text message stating

2

that Employer no longer needed Mickles's general manager-human resources position, and that Employer wanted Mickles to return to being a regular employee working weekends at $10 an hour.

Immediately after receiving the text message, Mickles contacted Employer's vice president, Eric Yoon, who spoke on Employer's behalf, to seek clarification regarding her job status. Mickles also met with Yoon in person the day after she received the text message. Mickles asked for an explanation why her position was no longer needed. She also stated that she would like to stay on with the company but could not accept a regular-employee position or the reduced pay rate or hours offered. No other offer was made by Employer, however, beyond the offer made in the text message.

When Mickles requested to be returned to one of Employer's store manager positions, Employer refused. Yoon stated that store managers were required to work 60 hours a week and that Mickles was not able to do so. At the hearing in this case, Mickles questioned the veracity of Employer's purported manager-hours requirement, and Yoon admitted that Employer has a store manager position at one of its locations that requires only "30 plus" hours of work per week. There is nothing in this record demonstrating that this particular store manager position or any other manager position was ever offered to Mickles.

Ultimately, Mickles declined to accept Employer's text-messaged offer. She filed for unemployment benefits, and a deputy for the Missouri Division of Employment Security determined that she was qualified to receive benefits, because she quit with good cause attributable to her work. The deputy noted that Employer's demotion "no longer allowed [Mickles] to use her managerial skills," and that "the reduction in pay was substantial." Employer appealed.

The Appeals Tribunal conducted a telephone conference hearing at which Mickles and Eric Yoon testified. The Appeals Tribunal agreed with the deputy's decision that Mickles was not disqualified for benefits, finding that Mickles met her burden of proving good cause to quit because

3

her "change in salary was significant enough to compel a reasonable person to cease working" for Employer.

Employer then appealed to the Commission, which reversed the decision of the Appeals Tribunal and found that Mickles voluntarily quit her job without good cause. The Commission concluded that Mickles failed to show good cause because she did not "explore the changed conditions of the revised employment arrangement with the employer," and because, in the Commission's view, a reasonable person would have maintained the employment relationship for as long as it took to seek other employment.

This appeal follows.

### Standard of Review

Our standard for reviewing decisions of the Commission in unemployment compensation cases is found in Article V, § 18 of the Missouri Constitution and § 288.210[1]. According to art. V, § 18, we must determine whether the Commission's decision is "authorized by law" and "whether it is supported by competent and substantial evidence upon the whole record." *Darr*, 428 S.W.3d at 719 (citing *Pulitzer Publishing Co. v. Labor & Indus. Relations Comm'n*, 596 S.W.2d 413, 417 (Mo.banc 1980)). Likewise, § 288.210 provides that this Court may modify, reverse, remand for rehearing, or set aside the Commission's decision upon finding (1) that the Commission acted without or in excess of its powers; (2) that the decision was procured by fraud; (3) that the facts found by the Commission do not support the decision; or (4) that there was not sufficient competent evidence in the record to support the decision.

Essentially, the Missouri Constitution and the Missouri Employment Security Law task this Court with reviewing the Commission's unemployment-compensation decisions for legal error. In conducting such review, we manifestly are not bound by any of the Commission's legal conclusions

---

[1] All statutory references are to RSMo 2016.

4

or applications of the law to the facts. *Turner v. Proffer Transp., Inc.*, 310 S.W.3d 769, 774 (Mo.App.E.D. 2010) (citing *Ayers v. Sylvia Thompson Residence Ctr.*, 211 S.W.3d 195, 198 (Mo.App.W.D. 2007)). We review questions of law *de novo*. *Difatta-Wheaton v. Dolphin Capital Corp.*, 271 S.W.3d 594, 596 (Mo.banc 2008). With regard to questions of fact, however, § 288.210 prohibits us from hearing new evidence and requires us, in the absence of fraud, to accept the Commission's factual findings so long as they are supported by competent and substantial evidence in the record. *Darr*, 428 S.W.3d at 719.

## Discussion

The general purpose of the Missouri Employment Security Law is to provide unemployment compensation to persons unemployed through no fault of their own. *Difatta-Wheaton*, 271 S.W.3d at 596 (citing § 288.020.1). We therefore construe that statute liberally to provide for the payment of compensation to individuals in respect to their unemployment. § 288.020.2. And we read disqualifying provisions strictly. *St. John's Mercy Health Sys. v. Div. of Emp't Sec.*, 273 S.W.3d 510, 514 (Mo.banc 2009).

> The disqualifying provision at issue here, § 288.050.1(1), provides in pertinent part:

> Notwithstanding the other provisions of this law, a claimant shall be disqualified for waiting week credit or benefits until after the claimant has earned wages for work insured pursuant to the unemployment compensation laws of any state equal to ten times the claimant's weekly benefit amount if the deputy finds: (1) That the claimant has left work voluntarily without good cause attributable to such work or to the claimant's employer.

The subsection defines "good cause" as "only that cause which would compel a reasonable employee to cease working or which would require separation from work due to illness or disability." § 288.050.1(1).

The question of good cause in this context is a legal issue that we review *de novo. See Darr*, 428 S.W.3d at 724 ("Whether good cause is established upon the particular facts of each case is a question of law, which we review independently without any deference to the Commission's

5

determination."). Consistent with the definition provided under § 288.050.1(1), good cause has long been understood to mean circumstances that would cause a reasonable person in a similar situation to leave the employment rather than continue working. *Id.* The conditions motivating the employee to voluntarily leave must be real, not imaginary, substantial, not trifling, and reasonable, not whimsical, and good faith is an essential element. *Id.* at 724-25. To establish good faith, the employee must prove that she made an effort to resolve the troublesome situation before ending the employment relationship. *Id.* at 725.

Here, we find Mickles ended her employment relationship *with good cause* and the Commission's finding to the contrary is not supported by competent and substantial evidence. First, her general manager-human resources position was eliminated with no advance notice to her, and she was informed abruptly by text message.[2] Then, when she requested to stay on with the company in one of Employer's store manager positions—because she had extensive experience as a manager for Employer, is a licensed cosmetologist, and holds a bachelor's degree in business management—Employer offered her only to return to her starting-level, regular employee position, with significantly less hourly pay (from $12.50 to $10 an hour), and only weekend hours. Mickles made multiple attempts to resolve the issues regarding her job status and future with the company—she discussed her employment situation with Employer's vice president, Eric Yoon, on the telephone and in person.

Nevertheless, no modification from the text-messaged offer was forthcoming from Employer and Mickles's only options were to accept a significant demotion and pay reduction for reasons

---

[2] There is no dispute that Employer summarily eliminated Mickles's general manager-human resources position without notifying her in advance. This case is therefore unlike *Kimble v. Div. of Emp't Sec.*, 388 S.W.3d 634 (Mo.App.W.D. 2013), Respondents' favored citation, because in *Kimble* the employee was informed ahead of time of the upcoming elimination of his position and was permitted to continue working in that position for one week while he considered an offer from his employer to stay on in a different position. *Id.* at 636-37. Moreover, the employer in *Kimble*, unlike here, offered the employee a new position that "had the potential of placing [the employee] in a comparable position financially." *Id.* at 643.

unrelated to her work performance, or to quit. Mickles described the situation as a "slap in the face"—an indication that Employer "really didn't care about [her] or [her] family." In these circumstances, we conclude that Mickles amply demonstrated a good faith effort to resolve the troublesome situation with which she was faced.

This Court has held that it is reasonable for an employee to quit when forced to accept a demotion coupled with a substantial decrease in pay. *See Armco Steel Corp. v. Labor & Indus. Relations Comm'n, Div. of Emp't Sec.*, 553 S.W.2d 506, 508 (Mo.App. 1977) (holding that "[a] substantial reduction in wages is regarded as 'good cause' so as to entitle a claimant to unemployment compensation benefits"). And it is a question of law whether Employer, by eliminating Mickles's general manager-human resources position and allowing her to stay on with the company only if she returned to her starting position as a regular employee, forced Mickles to accept a *substantial difference* in pay and working conditions or else go unemployed. *See Bordon v. Div. of Emp't Sec.*, 199 S.W.3d 206, 210 (Mo.App.W.D. 2006) ("Whether there is a substantial difference [in wages or work conditions effected by the employer] is a question of law.").

We find that the record here establishes that Employer's offer represented a substantial demotion, reduction in pay, and much less favorable working conditions and schedule. Mickles would have to relinquish her position of authority within the company and return to a regular employee position. As a result of the reduced hours of pay, Mickles would lose more than $100, on average, per week. For an employee whose usual weekly pay was between $300 and $350, $100 a week represents a substantial reduction in compensation.[3] Moreover, Employer knew that its text-

---

[3] Employer contends that the pay reduction in this case did not give Mickles good cause to leave her employment because the loss was not significant enough when measured as a percentage of her previous pay rate. We recognize that Missouri courts in cases such as *Armco*, 553 S.W.2d at 507-08, have in determining whether a reduction in pay was substantial or a "mere decrease" addressed the employee's reduction in pay as a percentage loss. We observe, however, that this percentage analysis on its own cannot in every case be considered determinative because an equal-percentage loss in pay will always fall more harshly on the less well-compensated of two individuals, perhaps severely so.

messaged offer meant that it was also revoking the employment benefit Mickles had theretofore enjoyed of bringing her child to work and thus saving childcare expenses.

We are therefore unmoved by the Commission's finding that Mickles lacked good cause based on its reasoning that she did not "explore the changed conditions of the revised employment arrangement with the employer" because that is not true and is not supported by this record.

Moreover, the Commission's judgment that a reasonable person would have maintained the employment relationship for as long as it took to seek other employment, even sustaining a demotion back to their non-managerial, low-level, starting position with the company, is unsupported by this record or by Missouri law. The Commission relied on *Mo. Div. of Emp't Sec. v. Labor & Indus. Relations Comm'n*, 625 S.W.2d 882 (Mo.App.E.D. 1981), but that case is readily distinguishable on its facts because there the employee only had his hours reduced. *Id.* at 884-85. Here, Employer reduced Mickles's hours, her rate of pay, and her job status.

And on the question of good faith mentioned by the court in *Darr, supra*, the contrast between Employer's conduct and Mickles's conduct is stark. Employer chose a text message to notify Mickles—an experienced management-level employee with no documented performance issues— that she had been demoted and her pay cut. Mickles, on the other hand, responded to the text message by demonstrating her desire to understand Employer's position and a willingness to seek a compromise. Following these efforts, Mickles understood that her general manager-human resources position was eliminated and Employer's sole offer was for her to return to being a regular employee working weekends at $10 an hour. Therefore, the Commission erred as a matter of law when it found that Mickles's future status was unclear and that it was incumbent on her to seek clarification. The

Moreover, we find that here, considering both the reductions in rate of pay and hours offered by Employer, it appears that Mickles would have sustained a percentage loss of about 25 percent per week, bringing her within the range found to support a finding of good cause in *Armco*. *See id.* (finding the 44 percent loss in the case was enough, and characterizing as "substantial" reductions losses of 25 percent in cases from other states).

8

offer was clear. Nothing in the record whatsoever supports the notion that Employer was willing to better the offer.[4] And Mickles repeatedly sought to clarify Employer's position.

## Conclusion

For the reasons stated above, we reverse the Commission's decision and remand with directions to award Mickles unemployment benefits.

_____
James M. Dowd, Judge

Sherri B. Sullivan, P.J., and
Lawrence E. Mooney, J., concur.

---

[4] At the hearing, in the briefs before this Court, and at oral argument, Employer has suggested somewhat cynically that Mickles may have been able to obtain some betterment of the text-messaged offer. This is pure speculation and not credible. Employer never hinted to Mickles that Employer was willing to consider any arrangement other than the text-messaged offer. And Employer had multiple opportunities to do so since Mickles repeatedly stated during her conversations with Yoon that she wanted to stay on.