

# In the Missouri Court of Appeals
# Eastern District

## DIVISION ONE

| | | |
|---|---|---|
| SUZANNE KOENEN, | ) | No. ED110045 |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Appeal from the Labor and Industrial |
| BRG LIBERTY, LLC, | ) | Relations Commission |
| | ) | |
| and | ) | |
| | ) | |
| DIVISION OF EMPLOYMENT SECURITY, | ) | |
| | ) | |
| Respondents. | ) | Filed: June 7, 2022 |

## I.    INTRODUCTION

Suzanne Koenen ("Koenen") appeals from the decision of the Missouri Labor and Industrial Relations Commission ("Commission"), which denied her claim for unemployment benefits after her employer, BRG Liberty, LLC ("Employer"), began reducing her work hours in March of 2020, at the very beginning of the COVID-19 pandemic, and eventually took her off the work schedule altogether without ever expressly terminating her employment.  Employer nonetheless opposed her benefits claim on the basis that she purportedly failed to report for work.  Koenen brings three points on appeal, each of which argues that the Commission erred in denying her benefits claim because the Commission's factual findings are not supported by the record.

We reverse and remand.

## II. STANDARD OF REVIEW

Our standard for reviewing the Commission's decisions in unemployment compensation cases is found in art. V, § 18 of the Missouri Constitution and § 288.210.[1] *Mickles v. Maxi Beauty Supply, Inc.*, 566 S.W.3d 274, 276-77 (Mo. App. E.D. 2019). "According to art. V, § 18, we must determine whether the Commission's decision is 'authorized by law' and 'whether it is supported by competent and substantial evidence upon the whole record.'" *Id*. at 277 (quoting *Darr v. Roberts Mktg. Grp., LLC*, 428 S.W.3d 717, 719 (Mo. App. E.D. 2014)). "Likewise, § 288.210 provides that this Court may modify, reverse, remand for rehearing, or set aside the Commission's decision upon finding (1) that the Commission acted without or in excess of its powers; (2) that the decision was procured by fraud; (3) that the facts found by the Commission do not support the decision; or (4) that there was not sufficient competent evidence in the record to support the decision." *Id*.

"Essentially, the Missouri Constitution and the Missouri Employment Security Law task this Court with reviewing the Commission's unemployment-compensation decisions for legal error. In conducting such review, we manifestly are not bound by any of the Commission's legal conclusions or applications of the law to the facts." *Id.* (citing *Turner v. Proffer Transp., Inc.*, 310 S.W.3d 769, 774 (Mo. App. E.D. 2010)). In addition, "[w]e review questions of law *de novo*." *Id.* (citing *Difatta-Wheaton v. Dolphin Capital Corp.*, 271 S.W.3d 594, 596 (Mo. banc 2008)). Regarding questions of fact, "§ 288.210 prohibits us from hearing new evidence and requires us, in the absence of fraud, to accept the Commission's factual findings so long as they are supported by competent and substantial evidence in the record." *Id.* (citing *Darr*, 428 S.W.3d at 719).

---

[1] All statutory references are to Mo. Rev. Stat. Cum. Supp. 2021, unless otherwise indicated.

"In examining the record, we must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, i.e., whether the award is contrary to the overwhelming weight of the evidence." *Darr*, 428 S.W.3d at 720 (quoting *Hubbell Mechanical Supply Co. v. Lindley*, 351 S.W.3d 799, 807 (Mo. App. S.D. 2011)). "We defer to the Commission's determinations on issues resolving matters of witness credibility and conflicting evidence," and thus, the Commission's decision should not be overturned "unless it is contrary to the overwhelming weight of the evidence." *Id*. Furthermore, we are not permitted to review the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award. *Id*. Rather, we must "objectively review the entire record, including evidence and inferences drawn therefrom that are contrary to, or inconsistent with, the Commission's award." *Id.* (quoting *Hubbell*, 351 S.W.3d at 807).

As specifically pertinent to this case, the issue of whether an employee terminated their employment voluntarily or was discharged is generally a factual determination. *Johnson v. Division of Employment Sec.*, 318 S.W.3d 797, 799 (Mo. App. W.D. 2010). "However, the standard of review is *de novo* when the issue is whether the facts found by the Commission can, as a matter of law, be considered to constitute a voluntary departure from employment." *Id*.

"If a claimant is determined to have voluntarily left work, the question becomes whether the claimant had good cause, attributable to the work or to the employer, to leave employment." *Darr*, 428 S.W.3d at 724 (citing § 288.050.1(1)). "Whether good cause is established upon the particular facts of each case is a question of law, which we review independently without any deference to the Commission's determination." *Id*.; *see also Mickles*, 566 S.W.3d at 277 (similarly recognizing that the issue of "good cause" in this context is a legal issue that we

3

review *de novo*). "The burden of proving the existence of good cause for leaving work attributable to work or to the employer is upon the claimant." *Darr*, 428 S.W.3d at 724.

### III.    FACTUAL AND PROCEDURAL HISTORY

On May 2, 2019, Koenen began working for Employer on an hourly basis. Employer operates a Burger King fast food franchise, and Koenen primarily worked in the dining room or at the front counter, but would also occasionally work the drive-thru line in order to give team members who regularly worked that job a break. However, Koenen admitted that she was not as proficient as many of her co-workers who worked the drive-thru line, stating that she is "older than these young kids"; thus, she preferred working in the dining room or at the front counter, where she felt most comfortable. Koenen also admitted that she was not trained as a cook and was not a manager. Although the record is not explicit in this regard, it appears that prior to March of 2020, Koenen was a permanent employee and regularly worked full-time shifts.

As with virtually all retail businesses, Employer was significantly affected when the COVID-19 pandemic struck our nation in the spring of 2020 (the "Pandemic"), which resulted in Employer shutting down its dining room service in mid-March of 2020. However, Employer still provided drive-thru service to customers during this time. As a result of Employer's dining room being closed, Koenen's hours were gradually cut over the following 2-3 weeks to the point where she was taken off the work schedule entirely by early April of 2020 and given no hours.[2] According to Employer, Koenen's last day of work was March 24, 2020. However, although Koenen initially stated that she did not remember the exact date she last worked, she believed it was April 4, 2020.

_____

[2] The record reflects that Koenen worked 47.65 hours for the pay period of March 4-17, 2020, and worked 15.95 hours for the pay period of March 18-31, 2020. No other evidence of Koenen's specific hours worked appears in the record.

4

Koenen made numerous requests to her manager, Donna Trent ("Ms. Trent"), to be kept on the work schedule as much as possible, claiming financial hardship if she did not have regular work hours. Nevertheless, Ms. Trent told Koenen that no hours were available for her, citing Employer's need to reduce labor costs due to the dining room being closed. Koenen maintains that she never received a notice of termination from Employer and Employer agreed that she was never terminated. In addition, Koenen maintains that she never gave Employer notice of her intent to leave her position, as she specifically stated that she "liked" her job and was "good" at it. On the contrary, after her hours were cut to zero, Koenen contacted the restaurant several times to ask whether she could get some hours, but had a difficult time getting through to anyone. When she was finally able to reach someone at the restaurant, she received the same answer as before—that no hours were available because the dining room was still closed. Specifically, Koenen was told that although her name was still on the work schedule, she simply had not been allocated any hours. The record does not reflect with whom Koenen spoke at this time, but Koenen recalls that it was not Ms. Trent. Koenen believes this conversation occurred on April 11 or 12, 2020. Koenen further testified that a few days after the foregoing phone conversation, she sent a text message to Ms. Trent, again inquiring about getting work hours. However, Ms. Trent never responded to the text message. Koenen also testified that shortly after sending Ms. Trent the text message, she physically went to the restaurant at a time when she believed Ms. Trent would be there, as she wanted to speak with Ms. Trent in person about her work situation, but Ms. Trent was not at the restaurant when Koenen visited.

Upon realizing that she was not going to get any work hours at Employer's restaurant for the foreseeable future, Koenen contacted other area Burger King franchises to ask about getting work hours, but she was unable to find any available hours, as each of those restaurants were

facing the same situation as Employer, and were likewise trying to reduce their labor costs by cutting non-essential worker hours. Thus, despite her repeated efforts, Koenen remained without any work hours in the weeks and months following the closure of Employer's dining room.

On or about April 17, 2020, Koenen filed an application for unemployment benefits with the Missouri Division of Employment Security (the "Division"). However, in a written determination dated July 14, 2020, a deputy of the Division determined that Koenen was disqualified for unemployment benefits on the basis that she "quit due to a reason that was not good cause connected to the work or the employer." Koenen subsequently learned that Employer reported to the Division that she had quit her job, specifically claiming that she had not shown up for work as scheduled. However, Koenen disagreed with this assertion, claiming that she had not been scheduled to work ever since her hours had been reduced to zero. Thus, Koenen reached out to Ms. Trent, believing that she must have been the one who made this report to the Division, either directly or through a supervisor. Yet, Ms. Trent stated that she had no idea what Koenen was talking about, claiming that she never spoke with anyone about Koenen's work status. When Koenen asked who could have made those damaging statements to the Division, Ms. Trent responded that it could have been someone from Burger King's "district or corporate office."

At the end of April 2020, one of Koenen's co-workers told her that Employer was cutting work hours even further, and that the dining room remained closed. At this time, Koenen also repeatedly sent text messages to Ms. Trent inquiring about work hours, but she never responded to any of Koenen's text messages.

Koenen timely appealed the deputy's denial of her claim for unemployment benefits to the Appeals Tribunal of the Division (the "Appeals Tribunal"). A telephone hearing was held on

March 1, 2021, before the Honorable Austin Fullerton ("Mr. Fullerton"), an appeals referee of the Appeals Tribunal. Koenen appeared at the hearing *pro se*, and Colleen Kelly ("Ms. Kelly"), a "Payroll HR Specialist" for Employer, testified on its behalf. At the outset of the hearing, Mr. Fullerton confirmed that Koenen was not eligible for unemployment benefits from April 4, 2020, onward because the deputy found that she had "left work voluntarily on April 4, 2020 without a good cause, attributable to the work or the employer." Thus, Mr. Fullerton stated that the hearing would determine whether, under § 288.050, Koenen "left work voluntarily or was discharged." He further stated that if Koenen left work voluntarily, the issue would be whether it was "for a good cause attributable to work." Conversely, if Koenen was discharged, the issue would be whether it was for "misconduct."

Koenen testified first at the hearing, which included testimony about her work history with Employer, the closure of Employer's dining room when the Pandemic first struck, her subsequent reduction in work hours, and her efforts to get work hours at Employer's restaurant and at other area Burger King franchises, as detailed above. With respect to the events leading to Koenen's claim for unemployment benefits, the following exchange is particularly noteworthy:

> MR. FULLERTON: Thank you. Did you voluntarily quit or were you discharged?
>
> KOENEN: Neither. I wasn't discharged by any means. Nor did I voluntarily quit.
>
> MR. FULLERTON: All right. Give me one second. Could you elaborate on the situations which led to your --- you stop working there [sic]?
>
> KOENEN: Okay. The separation reason would be I was told there was going to be a lack of work due to the dining room closing because of the COVID-19 pandemic. The dining room would be closed. They would only have drive-thru service. I was placed to work the dining room area and work with customers that came in the facility, not drive-thru. Therefore, my hours were cut to nothing. I got laid off. It was supposed to be temporary, while the restaurant part was closed. That I would be given hours when they reopened. But at that time,

7

everybody was pretty unsure of what the situation would be long-term. There was just labor costs were too high [sic] and she had to cut back on hours. Because I was designated dining area, and we're closed, there was just no work for me.

MR. FULLERTON: All right. So were your hours – were they like reduced to zero to the point where you were not working, or they just reduced [sic]?

KOENEN: At first, I noticed that I was scheduled less hours. By the next week I was scheduled one day, there was four hours and then it was switched to two hours. The next schedule, I was not scheduled for any hours whatsoever.

Following this exchange, Mr. Fullerton asked Koenen whether she discussed her concerns about her reduced hours with Employer, and Koenen confirmed that she had indeed raised the issue with Ms. Trent. In particular, Koenen testified that when she told Ms. Trent that she was not sure how she would pay her bills, Ms. Trent responded, "well, you got to do what you got to do."

In another noteworthy exchange at the conclusion of his direct examination, Mr. Fullerton asked Koenen whether she had anything to add to her testimony, and she stated as follows:

Well, I talked to Donna briefly after I realized that she had stated that I quit. That I did not show up for a scheduled work day, **which is <u>untrue</u>, because I was not scheduled**. There was no – from the time I last looked at the schedule, the last scheduled day for me to work. I was there actually four hours when I realized that it had been changed. I should have only been there for two hours. That I – and when called I was not scheduled.

(Emphasis added). Koenen went on to explain how Ms. Trent denied telling anyone at Employer that she had quit, and that Ms. Trent suggested that someone at Employer's district or corporate office was the likely culprit, as discussed above.

Ms. Kelly testified second at the hearing, and confirmed the details of Koenen's employment history with Employer, including that Koenen never received any type of "official notice of termination" from Employer. In fact, Ms. Kelly testified that Koenen was eligible for rehire, specifically stating that Koenen was "welcome" to apply for a position again. However,

8

when Mr. Fullerton questioned Ms. Kelly about the reason for Koenen's separation from Employer, her answers were vague at best, and inadmissible hearsay[3] at worst:

> MR. FULLERTON:  All right.  Why to the best of your knowledge did the claimant quit or were they terminated?
>
> MS. KELLY:  **From the DM[4] she reported to me that the claimant stopped showing up at the beginning of COVID**.
>
> MR. FULLERTON:  All right.  Was she – was the claimant terminated as a result of not showing up?
>
> MS. KELLY:  Well, if you don't show up for our handbook [sic] for three shifts then you are considered job abandonment [sic] and terminated.  But I don't have any – the only thing they told me was that she stopped showing off [sic].  **So I don't have exact dates or if there was like three exact scheduled shifts that she stopped, you know, or that she didn't show up for**.
>
> MR. FULLERTON:  All right.  Did to your knowledge the claimant give any intent to quit?
>
> MS. KELLY:  No.  Not to my knowledge.
>
> MR. FULLERTON:  Were you aware of any of the claimant's concerns regarding her work hours?
>
> MS. KELLY:  I was not.  No.

(Emphasis added).

Furthermore, one particular question from Mr. Fullerton to Ms. Kelly indicates that he all but totally disregarded Koenen's prior testimony about her substantial efforts to seek work hours after having them reduced to zero when Employer's dining room was closed:

---

[3] We note that even though Koenen did not expressly object to Ms. Kelly's testimony on the basis of hearsay, we must nonetheless view this testimony in light of our standard of review, which requires us to determine whether the Commission's decision is "supported by competent and substantial evidence in the record." *Mickles*, 566 S.W.3d at 277; *see also Darr*, 428 S.W.3d at 720.  Therefore, to the extent an objection to Ms. Kelly's hearsay testimony can be inferred from Koenen's other testimony at the hearing, any such hearsay testimony by Ms. Kelly cannot be considered competent or substantial evidence supporting the Appeals Tribunal's decision, as further explained in our analysis below (*see* section **IV.B**, *infra*).

[4] Elsewhere during her testimony at the hearing, Ms. Kelly specifically testified that Employer's "district manager," named Karen (no last name was given), reported that Koenen had "just … stopped showing up."  However, we can find no evidence in the record that this Karen had any direct knowledge of Koenen's work schedule and/or her purported failure to report for work.

MR. FULLERTON: All right. Had the claimant wish [sic] to continue working would there have been work?

MS. KELLY: I believe so yeah, we did not close the restaurant. So the drive-thru still remained open. So the hours of operation were still the same.

However, Ms. Kelly's answer above again seems speculative at best, especially given that, during Koenen's cross-examination about her sudden reduction of work hours, Ms. Kelly responded as follows: "Unfortunately, I mean, I don't have control over the scheduling of hours." In this regard, we further note that at the beginning of Koenen's cross-examination of Ms. Kelly, Koenen specifically inquired why her manager, Ms. Trent, was not present for the hearing. Ms. Kelly's response was simply: "We don't typically ask the GM's[5] to be present on the call. Since I am the manager of the HR and Payroll area, I usually handle these hearings."

Finally, we note that during her cross examination of Ms. Kelly, Koenen observed that Burger King restaurants typically had three or four managers working at the same time during the Pandemic, and specifically suggested that it would have been more "cost-efficient" to have some "lower-paying employees" working some hours. However, Mr. Fullerton cut off Koenen before she could finish asking her question, stating, "[i]f we could just keep this on topic a little bit if I may interject." Ms. Kelly never responded.

Before concluding the hearing, Mr. Fullerton asked both parties whether they had anything further to add to the record. After briefly reiterating that she was not fired for "bad work performance," and that she did not "quit just for the sake of quitting," among a few other closing remarks, Koenen confirmed she had nothing further. Ms. Kelly likewise confirmed that she had nothing further to add to the record. The hearing was then concluded and the matter was

---

[5] The term "GM" was not expressly defined during Ms. Kelly's testimony, but from the context we presume this means general manager.

taken under submission. However, the matter was thereafter reassigned to Referee Andrew Wilcox, who issued a written decision dated August 6, 2021 (the "Decision").

In the findings of fact section of the Decision, after finding that Koenen's last day of work was March 24, 2020 (making $10.25 per hour), the Appeals Tribunal specifically found that she did not work after that date "because [she was] taken off the schedule *due to COVID-19 related cutbacks*" (emphasis and alteration added). The Appeals Tribunal further found that Employer "was forced to close down their dining room and was only operating their drive-thru," and that although Koenen was "trained at operating the drive thru," she was "not as skilled at the task and desired to work the dining room." It also found that due to the closure of Employer's dining room, Koenen's work hours were cut "considerably," and that after being taken off the work schedule, Koenen "left to find work elsewhere, but was open to returning to work with [Employer]" (alteration added). In addition, the Appeals Tribunal found that Koenen "checked back several times [in April 2020] to see if there was work available, but received either a negative or no response each time" (alteration added).

Next, the Appeals Tribunal found that sometime following her last day of work, Koenen "was put back on the schedule, but failed to show up for several shifts." However, as noted above, Ms. Kelly specifically admitted at the hearing that she did not have the exact dates that Koenen was purportedly scheduled to work but did not show up. The Appeals Tribunal also found that Koenen brought her "concerns" regarding her reduction in work hours to her "manager" (presumably Ms. Trent), but further found that the manager made clear to Koenen that "the hour reduction was **not** temporary" (emphasis added). In addition, the Appeals Tribunal found that when Koenen raised concerns about paying her bills, the manager told her to "[d]o what [she] had to do" (alterations added). Finally, the Appeals Tribunal found that Koenen

11

"did not contact anyone else other than [her] manager or attempt to gain more hours by working the drive-thru" (alteration added).

In the conclusions of law section of the Decision, the Appeals Tribunal concluded as follows: "The claimant voluntarily separated from work on March 24, 2020, when [she] stopped showing up for [her] shifts" (alterations added). In addition, the Appeals Tribunal determined that, "[w]hile the claimant brought the issue of [her] work hour reductions to the attention of [her] supervisor, [she] took no further steps [to] resolve the issue. This includes, but is not limited to, training at the drive-thru so that [she] would be more comfortable performing the work that was available or contacting other stores where there were more work hours available" (alterations added). On this basis, the Appeals Tribunal ultimately concluded: "[C]laimant did have good cause to quit working for [her] employer on March 24, 2020" (alterations added). However, based on the fact that the Decision *affirmed* the deputy's prior determination that Koenen was disqualified for waiting week credit and unemployment benefits, it appears that the Appeals Tribunal intended to conclude that Koenen did <u>not</u> have good cause to quit working for Employer, since the stated conclusion would be entirely inconsistent with the prior factual findings discussed above.

Koenen timely filed an application for review with the Commission, which ultimately affirmed and adopted the Decision of the Appeals Tribunal by written decision issued on September 23, 2021. This appeal followed.

## IV. DISCUSSION

If there was ever a time in our history when individual workers needed the protection of employment security laws, it was certainly during the Pandemic that first struck our country in March of 2020, and continued for the better part of the following two years. It is well

12

documented that at the outset of the Pandemic, many retail businesses in Missouri, and the country at large, completely shut down for a period of time. Other businesses, like Employer, limited their operations during the ensuing weeks and months. Many businesses shut down voluntarily, while others were mandated to do so by local governments. In this case, the record does not reflect whether Employer's closure of its dining room in mid-March of 2020 was a voluntary decision or government mandated. Regardless, the underlying reason was essentially the same—concern for employee and customer safety when the mode of transmission and the health dangers of the COVID-19 virus were largely unknown to the public, if not most public health officials. It is also well documented that as a result of these business shutdowns, countless workers, including Koenen, found themselves out of work through no fault of their own.

Koenen raises three points on appeal relating to the Commission's decision to affirm the denial of her unemployment benefits claim. In her first point, Koenen argues that the Commission erred in finding that she was ineligible for unemployment benefits because the facts do not support this decision in that the Commission's factual findings actually indicate that Employer laid her off due to "COVID-19 related cut backs." In her second point, Koenen argues that the Commission erred in finding that she was ineligible for unemployment benefits on the grounds that she quit her job voluntarily without good cause because this decision was not supported by competent and substantial evidence in that the record shows that Employer laid her off. In her third point, Koenen argues that the Commission erred in finding that she voluntarily left her job without good cause attributable to Employer because the decision was not supported by competent and substantial evidence on the whole record in that the record shows she attempted to resolve the "troublesome situation before terminating her job." Because there is substantial overlap in the facts and applicable law regarding Koenen's three points, we address

13

them together, and find that they are all well taken and each warrant reversing and remanding to the Division. However, before addressing the merits of Koenen's three points, a brief review of the Missouri Employment Security Law is warranted.

A.    Missouri's Employment Security Law

Our starting point is the public policy of the Missouri Employment Security Law, Chapter 288, RSMo (the "Statute"), which is expressly declared in the Statute itself as follows:

> 1.  As a guide to the interpretation and application of this law, the public policy of this state is declared to be as follows: Economic insecurity due to unemployment is a serious menace to health, morals, and welfare of the people of this state resulting in a public calamity.  The legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this state require the enactment of this measure, under the police powers of the state, for compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.

> 2.  This law shall be liberally construed to accomplish its purpose to promote employment security both by increasing opportunities for jobs through the maintenance of a system of public employment offices and by providing for the payment of compensation to individuals in respect to their unemployment.

§ 288.020; *see also Difatta-Wheaton*, 271 S.W.3d at 596 (discussing § 288.020, RSMo (2008)).

With this declaration of public policy as our proverbial "north star" in interpreting and applying the relevant provisions of the Statute, we note that Missouri courts have also discussed the general purpose of the Statute, affirming that it is "to provide unemployment compensation to persons unemployed through no fault of their own."  *Mickles*, 566 S.W.3d at 277 (citing *Difatta-Wheaton*, 271 S.W.3d at 596 (citing § 288.020.1 RSMo (2008)).  Therefore, we are required to construe the Statute "liberally to provide for the payment of compensation to individuals in respect to their unemployment."  *Id*. (citing § 288.020.2).  Furthermore, we are

14

required to read disqualifying provisions "strictly." *Id*. (citing *St. John's Mercy Health Sys. v. Div. of Emp. Sec.*, 273 S.W.3d 510, 514 (Mo. banc 2009)).

As pertinent to this case, § 288.050.1 is the first specific provision of the Statute that governs our analysis of the dispositive legal issue herein, and provides, in pertinent part, as follows:

> Notwithstanding the other provisions of this law, a claimant shall be disqualified for waiting week credit or benefits until after the claimant has earned wages for work insured pursuant to the unemployment compensation laws of any state equal to ten times the claimant's weekly benefit amount if the deputy finds:
>
> (1) That the claimant has left work voluntarily without good cause attributable to such work or to the claimant's employer. * * * "**Good cause**", for the purposes of this subdivision, shall include only that cause which would compel a reasonable employee to cease working or which would require separation from work due to illness or disability.

(Emphasis in original). *See also Worley v. Division of Employment Sec.*, 978 S.W.2d 480, 482 (Mo. App. W.D. 1998) (generally recognizing that "[a] claimant is not eligible for unemployment benefits if she voluntarily quits her job without good cause attributable to the work or the employer" (citing § 288.050.1(1)). Furthermore, "[w]here an employer claims the employee voluntarily left without good cause, the employee/claimant has the burden of proving eligibility for unemployment benefits." *Id*. (citing *Kansas City Club v. Labor and Indus. Relations Comm'n*, 840 S.W.2d 273, 275 (Mo. App. W.D. 1992)). However, we must construe the provisions of § 288.050.1 "strictly and narrowly … in favor of finding that an employee is entitled to compensation." *Darr*, 428 S.W.3d at 724.

"An employee is deemed to have left work voluntarily when she leaves of her own accord as opposed to being discharged, dismissed or ***subjected to <u>layoff</u> by the employer***." *Worley*, 978 S.W.2d at 483 (emphasis added); *accord Darr*, 428 S.W.3d at 724. Furthermore, "[w]hile the terms that the parties use to describe cessation of an employee's employment may

15

be instructive, the relevant facts and circumstances are controlling." *Worley* 978 S.W.2d at 483 (quoting *Price v. Labor and Indus. Relations Comm'n of Missouri*, 811 S.W.2d 457, 459 (Mo. App. W.D. 1991)). "The determinative question is whether the employer or employee committed the final act which severed the relationship." *Darr*, 428 S.W.3d at 724.

"If a claimant is determined to have voluntarily left work, the question becomes whether the claimant had good cause, attributable to the work or to the employer, to leave employment." *Id*. (citing § 288.050.1(1)). "The determination of whether an employee had 'good cause' to leave his employment voluntarily is determined on a case-by-case basis." *Id*. "Good cause has been interpreted to mean those circumstances that would cause a reasonable person in a similar situation to leave the employment rather than continue working." *Id*.; *see also Mickles*, 566 S.W.3d at 277. Furthermore, the conditions that motivate an employee to leave voluntarily "must be real, not imaginary, substantial, not trifling, and reasonable, not whimsical, and good faith is an essential element." *Darr*, 428 S.W.3d at 724-25. "To establish the element of good faith, 'the employee must prove that he made an effort to resolve the troublesome situation before terminating his job.'" *Id*. at 725 (quoting *Shelby v. Haywood Baker, Inc.*, 128 S.W.3d 164, 170 (Mo. App. S.D. 2004)).

The second specific provision of the Statute that governs our analysis is § 288.050.2, which provides that a claimant is disqualified from receiving unemployment compensation benefits if the claimant has been discharged for "misconduct" connected with his or her work. *Hill v. Norton & Young, Inc.*, 305 S.W.3d 491, 493 (Mo. App. E.D. 2010). The Statute defines the term "misconduct" to include "[a] violation of an employer's no-call, no-show policy; chronic absenteeism or tardiness in violation of a known policy of the employer; or two or more

16

unapproved absences following a written reprimand or warning relating to an unapproved absence unless such absences are protected by law." § 288.030(23)(c).

"Although the burden of proving eligibility for unemployment compensation benefits initially lies with the claimant, once an employer alleges that the claimant was discharged for misconduct connected with work, the burden shifts and the employer must demonstrate such misconduct." *Hill*, 305 S.W.3d at 493. Specifically, "the employer must show, by a preponderance of the evidence, that the claimant willfully violated the rules or standards of the employer or that the claimant knowingly acted against the employer's interest." *Id*. at 493-94.

B.      Analysis

The record clearly reflects that in mid-March of 2020, Employer closed its dining room as a result of the Pandemic, which, in turn, resulted in Koenen's hours gradually being decreased over the following weeks, and eventually resulted in Employer not scheduling her for any hours thereafter. Therefore, through no fault of her own, Koenen was effectively out of a job by early April of 2020, although she was never formally terminated. Concerned with her personal finances, Koenen did what millions of Americans did at this time—filed a claim for unemployment benefits. However, Koenen's claim was denied because Employer reported to the Division that she had failed to report for work, and thus, was deemed by Employer to have "abandoned" her job. Disagreeing that she had been scheduled to work since her hours were reduced to zero in early April 2020, Koenen appealed the deputy's denial of her benefits claim, which ultimately forced a hearing before the Appeals Tribunal. However, the Appeals Tribunal affirmed the deputy's denial of Koenen's benefits claim, making several key factual findings that are simply not supported by the record, as further explained below. In addition, the Appeals

17

Tribunal reached several legal conclusions that are inconsistent with its own factual findings and the record.

The first and most glaring issue is the Appeals Tribunal's factual finding that after Koenen's hours had been reduced to zero, "[she] was put back on the schedule, but failed to show up for several shifts." This finding is key because the Appeals Tribunal further found that Employer viewed Koenen's purported failure to report as a "voluntarily quitting," and therefore, she was "taken of [sic] the scheduled [sic] permanently." Although Employer admitted that it never formally terminated Koenen, her purported failure to report was the basis for its objection to Koenen's claim for unemployment benefits. This factual finding was also the basis for the Appeals Tribunal concluding that Koenen "did not have good cause to quit working for [Employer] on March 24, 2020." However, the only evidence in the record to support this finding was Ms. Kelly's testimony that Employer's District Manager—an individual named Karen (last name unknown)—allegedly told her that Koenen "stopped showing up for work at the beginning of COVID." When Mr. Fullerton asked Ms. Kelly whether Koenen was terminated as a result, she simply referenced Employer's employee handbook policy that an employee's failure to report for three shifts is considered "job abandonment" and the employee is thereafter terminated. Ms. Kelly admitted that "the only thing **they** told me was that she stopped showing off [sic]."[6] Furthermore, Ms. Kelly admitted that she did not have the exact dates of any shifts that Koenen purportedly missed. Therefore, Employer's only evidence regarding Koenen's purported failure to report to work was a law school textbook example of hearsay testimony. *See State v. Kemp*, 212 S.W.3d 135, 146 (Mo banc 2007) ("A hearsay statement is any out-of-court statement that is used to prove the truth of the matter asserted and that depends

---

[6] Other than Ms. Kelly's prior reference to the District Manager, it is unclear who the "they" are Ms. Kelly was referencing.

on the veracity of the statement for its value."). Accordingly, we must now determine whether this hearsay testimony can be the basis for the Appeals Tribunal's key factual finding.

"The Missouri Code of State Regulations addresses the conduct of unemployment hearings and the use of hearsay evidence in those proceedings." *Jenkins v. George Gipson Enterprises, LLC*, 326 S.W.3d 839, 842 (Mo. App. E.D. 2010). Specifically, 8 CSR 10-5.015(10)(B)4 (2021) provides as follows:

> The hearing need not be conducted according to the common law or statutory rules of evidence or the technical rules of procedure. Hearsay evidence is generally admissible. Evidence is admissible if it is not irrelevant, immaterial, privileged or unduly repetitious. **Hearsay which is timely objected to shall <u>not</u> constitute competent evidence which, by itself, will support a finding of fact**. A party or his/her attorney may advise the hearing officer of a defect in the character of any evidence introduced by voicing an objection. The hearing officer shall rule on the admissibility of all evidence. Any evidence received without objection which has probative value shall be considered by the hearing officer along with other evidence in the case.

(Emphasis added); *see also Jenkins*, 326 S.W.3d at 842. Therefore, if the only evidence presented is hearsay, and that evidence is "timely objected to," the Commission's findings of fact are not supported by competent and substantial evidence. *Jenkins*, 326 S.W.3d at 842; *see also Hill*, 305 S.W.3d at 494. "Parties to an administrative hearing may waive objections to hearsay 'for reasons of trial strategy or other cause' and 'such hearsay evidence may then be considered as substantial and competent for purposes of the agency's findings.'" *Jenkins*, 326 S.W.3d at 842 (quoting *Helfrich v. Labor and Indus. Relations Comm'n, Div. of Employment Sec.*, 756 S.W.2d 663, 666 (Mo. App. E.D. 1988)). "However, a statement by a claimant that hearsay testimony is false 'cannot in any way be interpreted as a waiver of claimant's right to substantial and competent evidence' despite not rising to the level of an objection to hearsay or [a] motion to strike." *Id*. (quoting *Helfrich*, 756 S.W.2d at 666); *see also Hill*, 305 S.W.3d at 494-95 (holding that the claimant, who was not represented by counsel, made statements from which an objection

19

to hearsay testimony could be inferred, where she claimed that if the hearsay statement was actually made, "it was a lie"); *Jenkins*, 326 S.W.3d at 842-43 (holding that an objection to hearsay testimony could be "inferred" from the claimant's denial of the operative facts); and *Helfrich*, 756 S.W.2d at 666 (holding that the claimant did not waive her right to substantial and competent evidence, where she testified "he's lying" with respect to a purported conversation).

In this case, Koenen's objection to Ms. Kelly's testimony regarding her purported failure to report to work can be inferred from Koenen's testimony, during Mr. Fullerton's direct examination, that the statements of an unknown representative of Employer to the Division that she had failed to report for work when scheduled were "untrue" because she "was never scheduled." Although these statements, standing alone, constitute a viable objection, we further note that Koenen's question to Ms. Kelly, on cross examination, as to why Ms. Trent did not appear at the hearing further supports Ms. Koenen's general disagreement with Employer's position that she had been placed back on the schedule at some unspecified time after her hours were reduced to zero, presumably because Koenen understood that Ms. Trent was the best—and perhaps only—person with direct knowledge about her scheduled hours (or the lack thereof). This inference is certainly reasonable given Ms. Kelly's subsequent admission, during Koenen's cross examination, that she "[does not] have control over the scheduling of hours" (alteration added). In addition, Koenen testified that Ms. Trent was the only person she worked under or would have talked to about her work hours. Therefore, it was certainly reasonable for Koenen to expect that Ms. Trent would testify regarding her work schedule during the time period at issue. Of course, Koenen's general disagreement with Employer's position that she had been put back on the schedule is also supported by Koenen's repeated testimony, throughout the hearing, that she pleaded for work hours for several weeks before her benefits claim was denied, but was

repeatedly told that there were simply no hours available for her. Moreover, we note that the record is devoid of any evidence that even if, *arguendo*, Koenen had been put back on the schedule at some point, she was actually notified of that fact by any representative of Employer, including Ms. Trent.

Therefore, because Ms. Kelly's hearsay testimony was the only evidence in the record of Koenen's purported failure to report for work (to which Koenen's objection can be inferred), and in the absence of any evidence that Koenen was actually notified that she had been put back on the work schedule, the Appeals Tribunal's factual finding that Koenen "was put back on the schedule, but failed to show up for several shifts" is not based on competent and substantial evidence, as required under Missouri law. *See* 8 CSR 10-5.015(10)(B)4; *Helfrich*, 756 S.W.2d at 666; *Hill*, 305 S.W.3d at 494-95; *Jenkins*, 326 S.W.3d at 842-43. Accordingly, the Appeals Tribunal's conclusion of law that Koenen "did not have good cause to quit working for [Employer] on March 24, 2020" is erroneous as a matter of law and warrants reversal.

We further note that even if Koenen had waived her objection to Ms. Kelly's hearsay testimony regarding her purported failure to report for work, the Appeals Tribunal's legal conclusion that Koenen did not have good cause to quit would be erroneous for another reason. This is because Missouri courts are hesitant to deem the mere failure to report to work as a "voluntary quit" in the absence of the employee's clear rejection of the job. *See, e.g., Johnson*, 318 S.W.3d at 797. Specifically, the Western District in *Johnson* recognized that, "[t]he truth (and the common sense of it) is that not every failure to show up for work is an intentional rejection of the job." *Id*. at 802. As noted, Ms. Kelley testified that, per Employer's employee handbook, the failure to report for three shifts is considered "job abandonment" and the employee is terminated. Therefore, although Ms. Kelly admitted that it never sent Koenen a

21

formal termination notice, its opposition to Koenen's benefits claim on this basis indicates that Employer effectively terminated her for cause—violation of its attendance policy. However, a denial of Koenen's benefits claim on the basis of a "misconduct" analysis would also not be supported under *Johnson*, which has many factual similarities to this case.

As a preliminary matter, a misconduct analysis is warranted because, under our standard of review, "we will uphold a decision of the Commission if the Commission clearly got the right result, but for the wrong reason." *Id*. at 807 (citing *Finner v. Americold Logistics, LLC*, 298 S.W.3d 580, 584 (Mo. App. S.D. 2009)). Furthermore, although Employer did not expressly raise the issue of misconduct at the hearing, Mr. Fullerton did state at the outset of the hearing that if Koenen was discharged (as opposed to a voluntarily quit), the issue would be whether her discharge was for "misconduct"; therefore, Employer was entitled to argue and prove misconduct at the hearing. However, like the employer in *Johnson*, *id.* at 807-08, in this case Employer did not present any evidence of misconduct, other than simply claiming that Koenen violated its attendance policy, which called for termination after three missed shifts.

In *Johnson*, the employer opposed its former employee's benefits claim because she had missed two scheduled shifts due to personal transportation issues. *Id*. at 798-99. Specifically, the employer took the position that employee had voluntarily quit, despite the fact that she had called in both days to alert her manager that she was having car trouble. *Id*. The Commission ultimately agreed with the employer, finding that the employee's transportation problems were a "personal matter," and therefore, she had "left work voluntarily." *Id*. at 800. On this basis, the Commission found that the employee was disqualified from receiving unemployment benefits under § 288.050.1. *Id*.

22

On appeal, however, the Western District in *Johnson* challenged the Commission's analysis of the employee's failure to report to work within the framework of § 288.050.1(1), RSMo (2010) (i.e., whether the employee "left work voluntarily without good cause attributable to such work or to the claimant's employer"). *Id*. at 804. Rather, the Western District noted that such cases should actually be analyzed within the framework of § 288.050.2, RSMo (2010) (i.e., whether the employee was "discharged for misconduct connected with the claimant's work"). *Id*. Specifically, the Western District noted that in light of certain amendments to the Statute whereby an employee's violation of an employer's attendance policy may create a "rebuttable presumption" of misconduct under the then-current version of § 288.050.3, RSMo (2010)[7], a misconduct analysis is more appropriate in such cases, noting:

> The recent amendments suggest that the General Assembly has been attempting to direct the analysis away from the unrealistic use of the concept of "voluntary quit" and is seeking to show a preference for "misconduct" analysis in cases in which the employee purports to want to remain employed but is absent.

*Id*. In *Johnson*, the Western District thoroughly addressed the practice of analyzing cases involving termination based on absenteeism within the rubric of a "voluntary quit" (i.e., under § 288.050.1, RSMo. (2010)), noting that, "[w]e understand the phrase 'voluntary quit' and 'abandonment' when it is applied to an employee *intentionally resigning* from a job, especially

---

[7] Under the prior version of the Statute in effect when the *Johnson* case was decided, § 288.050.3, RSMo (2010), provided as follows: "Absenteeism or tardiness may constitute a rebuttable presumption of misconduct, regardless of whether the last incident alone constitutes misconduct, if the discharge was the result of a violation of the employer's attendance policy, provided the employee had received knowledge of such policy prior to the occurrence of any absence or tardy upon which the discharge is based." The term "misconduct" was previously defined as follows: "[A]n act of wanton or willful disregard of the employer's interest, a deliberate violation of the employer's rules, a disregard of standards of behavior which the employer has the right to expect of his or her employee, or negligence in such degree or recurrence as to manifest culpability, wrongful intent or evil design, or show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer." § 288.030.1(23), RSMo (2010). However, the Statute has since been amended, and the prior sub-section .3 has been removed from § 288.050 altogether. However, as noted, the term "misconduct," as used in § 288.050.2 (and elsewhere in Chapter 288), is currently defined to include: "A violation of an employer's no-call, no-show policy; chronic absenteeism or tardiness in violation of a known policy of the employer; or two or more unapproved absences following a written reprimand or warning relating to an unapproved absence unless such absences are protected by law." § 288.030.1(23)(c).

23

when the employee implies that he or she is 'fed up' with the job." *Id*. at 801 (emphasis in original). However, *Johnson* further stated that these terms are "*not* so easily understood in the context of an absent employee whose actions have indicated a desire to keep the job," noting that this distinction "should not be a surprise." *Id*. (emphasis in original). In this regard, *Johnson* acknowledged that sometimes a worker "will simply stop coming to work *without notice*, effectively resigning and abandoning the job." *Id*. (emphasis in original). However, *Johnson* added, "the reality is that many times absenteeism is caused by things that are unwelcomed and uncontrolled by the worker," and specifically noted that, in such cases, "it defies the ordinary meaning of the words to call the dismissal a 'voluntary quit.'" *Id*. (citing *Difatta-Wheaton*, 271 S.W.3d at 598; and *Moore v. Swisher Mower & Mach. Co.*, 49 S.W.3d 731, 738 (Mo. App. E.D. 2001)). After additional discussion regarding why absenteeism cases generally should not be analyzed under the rubric of a "voluntary quit," the Western District in *Johnson* summarized as follows: "The concept of 'voluntary quit' should therefore, we submit, presumably be reserved for those cases in which the employee not only does not show up, but also ***impliedly <u>rejects</u> the employment and the employer*** by some action such as failing to provide notification of the absence." *Id*. at 804 (emphasis added).

In this case, even if Koenen had not impliedly objected to Ms. Kelly's hearsay testimony about her purported failure to report for three unspecified shifts, there is not one shred of evidence in the record from which the Commission could have concluded that Koenen rejected—expressly, impliedly, or otherwise—her job or Employer. On the contrary, the record reflects that Koenen valued her job and very much wanted keep working for Employer, citing dire financial consequences to Ms. Trent if she did not get sufficient work hours. Therefore, the

24

Commission's analysis of Koenen's benefits claim under the rubric of a "voluntary quit" was inappropriate under the particular facts of this case, as set forth in *Johnson*.

On the other hand, even if the Commission had attempted to analyze Koenen's benefits claim under the rubric of misconduct claim (pursuant to §§ 288.050.2 and 288.030.1(23)(c)), a finding that Koenen was properly terminated would likewise have been erroneous. This is because, even if Koenen had been placed back on the schedule as Ms. Kelly suggested, there was no evidence that she was properly notified of those new shifts. As noted, Ms. Kelly readily admitted at the hearing that she did not even know the exact dates of any shifts that Koenen was purportedly scheduled to work but failed to report. Given the extenuating circumstances under which Koenen's hours were eliminated, and given the ample evidence that Employer knew (by and through Ms. Trent) of her desire to keep her job, evidence that Koenen had been properly notified was vitally important, as Employer could not simply assume that Koenen would automatically know whether and when to report. This is particularly true in light of the Appeals Tribunal's factual finding that Koenen's manager "made clear" that her work hour reduction "was not temporary." In addition, Koenen testified that, after expressing her concern with having her hours reduced to zero, Ms. Trent promised to provide her with work hours as soon as she could. Therefore, Koenen could not reasonably be expected to contact Employer *ad infinitum* to inquire about getting work hours in order to preserve her benefits claim. Furthermore, although Ms. Kelly vaguely testified about Employer's attendance policy in the employee handbook, it was neither offered nor admitted as evidence at the hearing. Therefore, the record is woefully insufficient to support a finding that Koenen knew the attendance policy and knowingly violated it, especially given the extenuating and unprecedented circumstances present at the time. It goes without saying that all employers and employees were in totally

uncharted waters in the spring of 2020 with respect to navigating employment practices during the early stages of the Pandemic. Accordingly, the record in this case simply does not support a finding that Koenen either voluntarily quit or was properly terminated for misconduct. Rather, the only reasonable conclusion supported by the record is that Koenen was simply laid off due to the pandemic, and as such, it was error to deny her unemployment benefits claim. *Worley*, 978 S.W.2d at 483 ("An employee is deemed to have left work voluntarily when she leaves of her own accord as opposed to being discharged, dismissed or ***subjected to <u>layoff</u> by the employer*.**" (emphasis added)); *Hill*, 305 S.W.3d at 493-94 (in order to show misconduct, "the employer must show, by a preponderance of the evidence, that the claimant willfully violated the rules or standards of the employer or that the claimant knowingly acted against the employer's interest"). Therefore, since "the determinative question is whether the employer or employee committed the final act which severed the relationship," *Darr*, 428 S.W.3d at 724, we conclude that neither party was truly *responsible* for severing this employment relationship; rather, they were both unfortunate victims of the Pandemic. However, as between Employer and Koenen, it would be entirely contrary to both the letter and spirit of the public policy of the Statute, as stated in § 288.020, to penalize Koenen by denying her benefits claim based on the totality of the record before us. *See also Mickles*, 566 S.W.3d at 277 (noting that courts must construe the Statute "liberally to provide for the payment of compensation to individuals in respect to their unemployment," and further, must "read disqualifying provisions strictly").

Next, we note several inconsistencies in the Decision that warrant specific discussion and further support our holding. First, we take issue with the conclusion of law that even though Koenen "brought the issue of [her] work hour reductions to the attention of [her] supervisor, *[she] took no further steps to resolve the issue*" (emphasis and alterations added). In this regard,

26

the Appeals Tribunal generally noted that, "[i]n order for a claimant to be considered as having good cause for quitting, they must demonstrate that they took **reasonable steps** to resolve the issue" (emphasis added), but cited no authority in support. With respect to the steps the Appeals Tribunal believed Koenen could have and should have taken, it noted that this includes "training at the drive thru so that [she] would be more comfortable performing the work that was available or contacting other stores where there were more work hours available" (alteration added).

However, the foregoing conclusion of law is directly contradicted by the Appeals Tribunal's own factual findings and the record. As an initial matter, the conclusion of law that Koenen "took no further steps to resolve the issue" of her work hours reduction is directly contradicted by the Appeals Tribunal's factual finding that Koenen "left to find work elsewhere, but was open to returning to work with [Employer.]" Although not explicitly addressed in the Decision itself, Koenen specifically testified at the hearing that she had sought work hours at other area Burger King franchises, but was given the same answer as Employer—they did not have any available hours due to cutbacks. In addition, this conclusion is directly contradicted by the Appeals Tribunal's factual finding that Koenen "checked back several times that month [April of 2020] to see if there was work available, but received either a negative or no response each time" (alteration added). This particular factual conclusion is indeed supported by the record, as Koenen testified at length about her efforts to get work hours at Employer's restaurant, but all to no avail. Based on the ample and uncontradicted record regarding Koenen's efforts to obtain work hours (at Employer's restaurant and at other Burger King franchises), we can hardly imagine what else Koenen could have done, within reason, to "resolve the issue" of her unilaterally being taken off the work schedule altogether in early April 2020 due to Employer's COVID-related cutbacks.

With respect to the Appeals Tribunal's suggestion that Koenen was *required* to undertake additional training on working the drive-thru to feel more comfortable, there are at least two problems with this premise. First, the Appeals Tribunal cited no authority for the proposition that Koenen had such a duty in the first place, and we can find none. The only case cited in the Decision was the Western District's opinion in *Contractors Supply Co. v. Labor and Indus. Relations Comm'n*, 614 S.W.2d 563 (Mo. App. W.D. 1981).[8] While *Contractors Supply Co.* recognized that under § 288.050.1(1), the Statute disqualifies a worker from unemployment compensation benefits if the worker leaves their work "voluntarily without good cause attributable to his work or to his employer," the Court further noted that a worker has "good cause" to terminate their employment voluntarily "when that conduct conforms to what an average person, who acts with reasonableness and in good faith, would do." *Id*. at 564. In this regard, *Contactors Supply Co.* further noted that although the burden to prove good cause rests on the claimant, "whether the evidence meets the burden poses a question of law." *Id*. In this case, we conclude that, based on the totality of the record before us, Koenen certainly did everything reasonably within her power to obtain work hours and acted in good faith at all times, but her diligent efforts were nonetheless unsuccessful due to the unprecedented circumstances existing at the time, which need no further explanation.

The second problem with the Appeals Tribunal's suggestion that Koenen was required to undertake additional drive-thru training is that the record is devoid of any evidence that: (1) Employer actually offered Koenen additional training on the drive-thru; and (2) assuming, *arguendo*, Employer offered Koenen such training, that she rejected it. Given Koenen's testimony that she did not regularly work the drive-thru, and that the restaurant's younger

---

[8] The Appeals Tribunal cited *Contractors Supply Co*., 614 S.W.2d at 564, for the general proposition that "[t]he burden to prove good cause rests on the claimant."

workers were much more proficient than her, it is certainly reasonable to infer from the record that Employer was satisfied having those younger workers operate the drive-thru, and was not looking for Koenen to work the drive-thru, even with additional training. *See Darr*, 428 S.W.3d at 720 ("[W]e must objectively review the entire record, including evidence and inferences drawn therefrom that are contrary to, or inconsistent with, the Commission's award."). While Koenen testified that she *preferred* working in the dining room, there was simply **no** evidence that Employer actually offered her hours working the drive-thru (with or without additional training) and that she refused. However, it appears that the Appeals Tribunal erroneously leapt to these conclusions in rendering the Decision. Regardless, given the particular facts of this case, it was error for the Appeals Tribunal to penalize Koenen, as it apparently did, for not demanding that Employer provide her with additional training on the drive-thru, especially given the absence of any evidence that Employer was actually willing to provide such training to Koenen and then schedule her to work the drive-thru until the dining room reopened.

With respect to the Appeals Tribunal's suggestion, in the conclusions of law section of the Decision, that Koenen was required to "contact[] other stores where there were more work hours available" (but failed to do so), this is also simply not supported by the record. As discussed, Koenen testified that she did contact other area Burger King franchises about getting work hours, but those efforts were unsuccessful. Employer presented no contrary evidence. In addition, the Appeals Tribunal's suggestion that Koenen was required but failed to seek work hours at other area stores is directly contradicted by its own finding of fact, to wit: "After being taken off the schedule for an upcoming week, *the claimant left to find work elsewhere*, but was open to returning to work with [Employer]" (emphasis and alteration added). Therefore, to the

extent that this specific legal conclusion factored into the Appeals Tribunal's ultimate conclusion that Koenen did not have "good cause" to quit working for Employer, it was error to consider it.

Finally, we note that the Appeals Tribunal found that Koenen "did not contact anyone else other than [her] manager" (alteration added) about getting work hours. While this appears to be true (based on our review of the record), the fact that the Appeals Tribunal specifically noted this fact suggests that it believed Koenen had an affirmative duty to go over her manager's head and request hours from higher level management in order to preserve her unemployment benefits claim, despite all her other efforts to obtain work hours. However, we do not construe the Statute, and the cases interpreting it, as imposing any such duty on a claimant in Koenen's position, especially considering the unprecedented circumstances that led to her benefits claim. The sole reason Koenen was taken off the schedule in April of 2020, as the Appeals Tribunal expressly found, was "due to COVID-19 related cut backs." Therefore, to the extent the Appeals Tribunal imposed an affirmative duty on Koenen to go over her manager's head and request hours from higher level management in order to preserve her unemployment benefits claim, it was error to do so under the particular facts of this case.

Given the facts of this case, the Appeals Tribunal erred as a matter of law in concluding that Koenen "voluntarily separated from work on March 24, 2020, when [she] stopped showing up for [her] shifts" (alteration added). In addition, the Appeals Tribunal erred as a matter of law in ultimately concluding that Koenen "did not have good cause to quit working for [her] employer on March 24, 2020" (alteration added). As explained above, neither of these conclusions are supported by competent and substantial evidence, as required under Missouri law. *See* Mo. Const. art. V, § 18; § 288.210; *Mickles*, 566 S.W.3d at 276-77. Moreover, as the Appeals Tribunal's relevant factual findings did not involve any matters of witness credibility or

30

conflicting evidence, we are not required to defer to them. *Darr*, 428 S.W.3d at 720. Accordingly, the Appeals Tribunal erred as a matter of law in affirming the Deputy's denial of Koenen's unemployment benefits claim and determining that she is disqualified for waiting week credit and benefits until she has earned wages in accordance with the Statute after March 24, 2020, and the Commission likewise erred in affirming the Appeals Tribunal's Decision. To summarize with respect to Koenen's three claims of error, we conclude that: (1) the record clearly demonstrates that Koenen was laid off due to "COVID-19 related cut backs"; (2) the record does not support the Commission's conclusion that Koenen quit her job voluntarily without good cause attributable to the work or to Employer because, as stated with respect to Koenen's first point, she was laid off by Employer; and (3) Koenen did take reasonable steps to resolve the issue of being taken off the work schedule, but her efforts were unsuccessful due to the unprecedented circumstances existing at the time, which were beyond her control.

Points one, two, and three are granted.

## V. CONCLUSION

For the reasons stated above, we conclude that the Commission erred in finding that Koenen was disqualified from receiving unemployment benefits pursuant to § 288.050.1(1). Therefore, we reverse the Commission's decision and remand for a determination of Koenen's unemployment benefits in accordance with this opinion and applicable Missouri law.

_____
Kelly C. Broniec, Judge


Kurt S. Odenwald, P.J. and
John P. Torbitzky, J. concur.

31